BANKERS TRUST COMPANY, Plaintiff,

v.

WORLDWIDE TRANSPORTATION SERVICES, INC., and Compania Nacional De Subsistencias Populares, Defendants.

No. LR–C–80–31.

United States District Court,
E. D. Arkansas, W. D.

April 29, 1982.

Vincent Foster, Jr., Rose, Nash, Williamson, Carroll, Clay & Giroir, Little Rock, Ark., for plaintiff.

Mike Thompson and Joseph E. Kilpatrick, Jr., Friday, Eldredge & Clark, Little Rock, Ark., for Worldwide Transp.

Bill Clinton, Wright, Lindsey & Jennings, Little Rock, Ark., for CONASUPO.

## MEMORANDUM OPINION

ROY, District Judge.

This case initially involved an action filed on January 18, 1980, by Bankers Trust Company ("Bankers Trust" or "Bankers"), a New York bank, against Worldwide Transportation Services, Inc. ("Worldwide"), for restitution in the amount of $299,700.00. The litigation arose from an alleged error on the part of Bankers in transferring funds from the account of Compania Nacional de Subsistencias Populares ("CONASUPO") at Bankers' place of business in New York, New York, to an account of Worldwide, as agent for CONASUPO, which was located at The First National Bank in Little Rock, Arkansas. Subsequent to the filing of the original complaint herein, Worldwide filed a motion to require Bankers to join CONASUPO as an indispensable party defendant, alleging that $300,000.00 was transferred by Bankers to Worldwide for the purpose of paying outstanding freight charges and related bills owed by CONASUPO. The Court granted Worldwide's motion and ordered Bankers to file an amended complaint joining CONASUPO as a party defendant.

On December 16, 1980, Bankers served its amended complaint on CONASUPO alleging that the action was based upon a com-

mercial activity of CONASUPO in the United States, or upon an act performed in the United States in connection with a commercial activity of CONASUPO; that Bankers was instructed by CONASUPO to wire $300.00 to Worldwide; that Bankers mistakenly wired $300,000.00 to Worldwide; that Bankers has only debited CONASUPO $300.00 for the transfer; that Worldwide has refused to return the $299,700.00 overpayment to Bankers because it used the funds to pay debts of CONASUPO; and that, if Worldwide in fact used the funds for CONASUPO's benefit, Bankers is entitled to restitution from CONASUPO.

Worldwide filed a cross-complaint against CONASUPO alleging in Count I that a contract between Worldwide and CONASUPO had been entered into on June 8, 1978, whereby Worldwide was to act as CONASUPO's agent with regard to the transportation, storage, loading and inspecting of various commodities purchased by CONASUPO in the United States; that under this agreement Worldwide would advise CONASUPO of any charges incurred on the latter's account, whereupon CONASUPO would send funds to cover the charges to The First National Bank of Little Rock account which Worldwide held as trustee for CONASUPO; that just prior to the receipt of the $300,000.00 from Bankers Trust, Worldwide had requested $300,000.00 from CONASUPO to pay outstanding bills; and that the $300,000.00 actually sent was in fact used to pay debts incurred by Worldwide on behalf of CONASUPO.

Count II of Worldwide's cross-complaint alleges that CONASUPO owes Worldwide some $830,167.83 for services rendered under the contract covering the period July 1, 1978—June 30, 1979. A further $999,996.00 is claimed for the period July 1, 1979—June 30, 1980. Count III alleges, as an alternative to Count II, that Worldwide is entitled to $2,000,000.00 from CONASUPO under the theory of quantum meruit, said amount being the value of alleged information and services rendered by Worldwide.

CONASUPO has filed motions to dismiss both the amended complaint and the cross-complaint for lack of personal jurisdiction, waiver of the forum and *forum non conveniens.* CONASUPO asserts that this Court does not have personal jurisdiction over it because it has not had sufficient contacts either with Arkansas or with the United States to support the exercise of this Court's jurisdiction; that Worldwide has waived the jurisdiction of this Court, or any other court, in favor of the courts of Mexico City, Federal District, Mexico; and that, alternatively, if this Court has personal jurisdiction over CONASUPO, it should decline to exercise jurisdiction under the doctrine of *forum non conveniens.*

A hearing was held on the motions to dismiss, wherein testimony was heard and documentary evidence was introduced. The matter has been thoroughly and competently briefed by all parties and is now ripe for resolution. The evidence presented to the Court reveals the following facts:

CONASUPO is a decentralized organism of the Federal Republic of Mexico, charged by public law to stabilize domestic price supports and purchases of foreign agricultural staples, such as wheat, rice, corn and beans. It is somewhat comparable to the U. S. Department of Agriculture. In 1977 CONASUPO began to purchase substantial amounts of soybean meal and soybean oil from American companies. These purchases were made "f. o. b. loaded/stowed CONASUPO vessels" at the port of New Orleans. Because CONASUPO had no agent within the United States at the time, it had to purchase the commodities from United States companies either delivered to Mexican ports or loaded/stowed on CONASUPO vessels at United States gulf ports.

Subsequently, in order to be able to acquire title to the commodities at inland points of origin within the United States or delivered to gulf ports alongside vessels, CONASUPO entered into negotiations with Worldwide for the purpose of engaging the latter as its agent to coordinate the movement within the U. S. continental boundaries of the commodities purchased by CONASUPO in America for export to Mexico.

The negotiations opened in New Orleans, Louisiana, on March 2 and 3, 1978, and were attended by Mr. Joe Baldridge, president of Worldwide, and by three representatives of CONASUPO. Subsequent to the New Orleans meeting, negotiations continued by telephone. On June 1, 1978, Mr. Baldridge and other Worldwide personnel, together with their attorneys, met personally with CONASUPO representatives in Mexico City for the purpose of preparing the final contract. The negotiations, as well as the contract itself, were in Spanish. On June 8, 1978, the contract was signed by CONASUPO officials and forwarded to North Little Rock, Arkansas, to Mr. Baldridge who signed it on June 12, 1978, and returned it to Mexico City.

The contract provided, *inter alia*, that Worldwide would, on behalf of CONASUPO, oversee the transportation of goods from the Gulf Coast and Mississippi River ports to Mexico, and that Worldwide would receive payment for its services by funds wired by CONASUPO to Worldwide's bank in Little Rock. As a guarantee of performance, Worldwide established an irrevocable letter of credit payable to CONASUPO in Mexico in the amount of $100,000.00.

Included in the contract in Clause 8 were the following terms:

"8th—*Jurisdiction.*—For the interpretation of this contract and for the exercise of the rights and actions that it grants to the parties, these expressly submit themselves to the Laws and Courts of the City of Mexico, Districto Federal, waiving any other jurisdiction, present or future, that would be the corresponding one."

Worldwide asserts that it was unaware of the conditions of Clause 8 until the June 1, 1978, meetings in Mexico City began. Worldwide was informed at that time that the clause would have to be included in any contract between the parties and that the matter was not subject to further negotiation. CONASUPO officials also maintained that the clause was standard language that typically appeared in its contracts. Having already invested a great deal of time and substantial sums of money in the negotiations with CONASUPO, Worldwide reluctantly agreed to the inclusion of Clause 8.

As set forth above, Worldwide was to supervise the transportation, loading, unloading, and other services required in connection with the movement of CONASUPO's agricultural purchases within the United States from interior points of origin to Mexico. During the period of the contract between July 1, 1978, and July 31, 1979, Worldwide arranged for the transportation, loading, unloading, and acquisition of documentation relating thereto of over two million metric tons of agricultural commodities purchased by CONASUPO from American firms. The cost of these services was in excess of $4,000,000.00.

CONASUPO directed Worldwide, as CONASUPO's agent, to open a special CONASUPO bank account with The First National Bank in Little Rock, Arkansas, in order to facilitate the payment of transportation charges which were being incurred by Worldwide on behalf of CONASUPO. The account was opened in the name of "Worldwide Transportation Services, Inc., as trustee for CONASUPO" and is identified as account No. 0–15452–0. From July 1, 1978, through July 31, 1979, CONASUPO caused its agent banks in New York and Dallas to make twenty-six separate transfers to the Little Rock account totaling $4,227,040.00.

From time to time during the relevant period mentioned above, as CONASUPO would enter into agreements with United States firms to purchase agricultural commodities, it would advise Worldwide of its activities and issue instructions with respect to the movement of the purchases from inland points of origin to their final destination in Mexico. As noted above, Worldwide then made the necessary arrangements with United States transportation companies to move, load and unload the commodities involved, paying for such services from the CONASUPO special account with The First National Bank in Little Rock, Arkansas.

It is from this background which outlines the course of dealing between the parties that the instant suit arose. On June 1,

1979, CONASUPO wired its New York bank, Bankers Trust Company, to transfer $300.00 to Worldwide's trust account at The First National Bank in Little Rock, Arkansas. On June 4, 1979, through computer error, Bankers mistakenly transferred $300,000.00 to First National, which sum was credited to Worldwide's account No. 0–15452–0. Bankers debited CONASUPO's account in New York for the large amount, but when CONASUPO notified Bankers of the error, Bankers promptly recredited CONASUPO's account for the difference in the requested transfer and the actual transfer ($299,700.00). Bankers then debited itself for this amount, and on July 11, 1979, Bankers requested First National to refund the overpayment. First National refused, as did Worldwide.

Prior to the transfer, Worldwide had notified CONASUPO of the pendency of a number of charges from third parties which had been incurred by Worldwide on CONASUPO's behalf, which charges amounted to approximately $300,000.00. When Bankers transferred this amount into Worldwide's account at First National, Worldwide assumed that CONASUPO was simply responding to Worldwide's earlier request. Hence, Worldwide paid the various bills which had accumulated as a result of its services for CONASUPO. The balance which remained in the account has been deposited into the registry of the court.

Such is the factual background which has given rise to this lawsuit. Any discussion of the legal principles involved must begin with an analysis of the Foreign Sovereign Immunities Act of 1976 (28 U.S.C. §§ 1602–1611) (hereinafter "FSIA").

As noted by the Second Circuit Court of Appeals in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria, et al.*, 647 F.2d 300 (1981) ("Texas Trading"),

"The law before us is complex and largely unconstrued, and has produced sweeping changes in some areas of prior law. *See* House Judiciary Committee, *Jurisdiction of United States Courts in Suits Against Foreign States*, H.R.Rep.No.1487, 94th Cong., 2d Sess. 7–8, *reprinted in*

[1976] U.S.Code Cong. & Admin.News 6605, 6604–6 ("House Report"). [Footnote omitted.] In structure, the FSIA is a marvel of compression. Within the bounds of a few tersely worded sections, it purports to provide answers to three crucial questions in a suit against a foreign state: the availability of sovereign immunity as a defense, the presence of subject matter jurisdiction over the claim, and the propriety of personal jurisdiction over the defendant. See *House Report* at 1611–1612." 647 F.2d at 306.

The *Texas Trading* court then noted that, upon superficial perusal, the FSIA seems to make the answer to one of the questions, subject matter jurisdiction, dispositive of all three questions. In reality, however,

"Congress intended the sovereign immunity and subject matter jurisdiction decisions to remain slightly distinct, and it drafted the Act accordingly. Moreover, Congress has only an incomplete power to tie personal jurisdiction to subject matter jurisdiction; its prerogatives are constrained by the due process clause." 647 F.2d at 307.

The section of the Act whereby jurisdiction is conferred provides that,

"(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

"(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under Section 1608 of this title." 28 U.S.C. § 1330.

The most frequently applicable, and the one relevant in the instant case, of the sections referred to above is § 1605(a)(2):

"§ 1605. General exceptions to the jurisdictional immunity of a foreign state.

"(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;"

The definitions section of the Act provides as follows:

"§ 1603. Definitions.

"For purposes of this chapter—

"(a) A 'foreign state' ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

"(b) An 'agency or instrumentality of a foreign state' means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title [28 U.S.C.S. § 1332(c), (d)], nor created under the laws of any third country.

"(c) The 'United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

"(d) A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

"(e) A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States."

In order to ascertain whether jurisdiction lies in a case brought against a foreign state, an analysis must be made under both the FSIA and under traditional due process concepts of minimum contacts. The history of the Act reflects without question that Congress intended to incorporate such due process notions into the legislation. In its report, the House Committee stated,

"Personal Jurisdiction.—Section 1330(b) provides, in effect, a Federal long-arm statute over foreign states (including political subdivisions, agencies, and instrumentalities of foreign states). It is patterned after the long-arm statute Congress enacted for the District of Columbia, Public Law 91–358, sec. 132(a), title I, 84 Stat. 549. The requirements of minimum jurisdictional contacts and adequate notice are embodied in the provision. Cf. *International Shoe Co. v. Washington*, 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95] * * *, and *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 [78 S.Ct. 199, 2 L.Ed.2d 223] * * * (1957). For personal jurisdiction to exist under section 1330(b), the claim must first of all be one over which the district courts have original jurisdiction under section 1330(a), meaning a claim for which the foreign state is not entitled to immunity. Significantly, each of the immunity provisions in the bill, sections 1605–1607, requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction. These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction. Besides incorporating these jurisdictional contacts by reference, section 1330(b) also

satisfies the due process requirement of adequate notice by prescribing that proper service be made under section 1608 of the bill. Thus, sections 1330(b), 1608, and 1605–1607 are all carefully interconnected." [Footnotes omitted.]

H.Rep.No.94–1487, 94th Cong., 2d Sess. 13, 14 (1976), reprinted in 1976 U.S.Code Cong. & Admin.News at pp. 6604, 6612.

Since the passage of the Act, courts having occasion to interpret it have consistently applied this dual scope of analysis. See, e.g., Gemini Shipping, Inc., v. Foreign Trade Organization for Chemicals and Foodstuffs, et al., 647 F.2d 317 (2d Cir. 1981); Texas Trading & Milling Corp. v. Federal Republic of Nigeria, et al., supra; Decor by Nikkei International, Inc., v. Federal Republic of Nigeria, et al., 497 F.Supp. 893 (S.D.N.Y.1980), aff'd 647 F.2d 300 (2d Cir. 1981); Chicago Bridge & Iron Co. v. Islamic Republic of Iran, 506 F.Supp. 981 (N.D.Ill.1980); Thomas P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica, 614 F.2d 1247 (9th Cir. 1980); Carey v. National Oil Corp., 592 F.2d 673 (2d Cir. 1979); and Harris v. VAO Intourist, Moscow, 481 F.Supp. 1056 (E.D.N.Y.1979).

Our inquiry shall thus commence with a discussion of the FSIA and its application to this case. One area about which there can be no dispute is that CONASUPO is in fact an "agency or instrumentality of a foreign state" as that term is defined in 28 U.S.C. § 1603 above. As such, it is conditionally protected from suit under 28 U.S.C. § 1604:

"§ 1604. Immunity of a foreign state from jurisdiction. Subject to existing international agreements to which the United States is a party at the time of enactment of this Act [enacted Oct. 21, 1976] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter [28 U.S.C.S. §§ 1605–1607]." [Emphasis supplied.]

Section 1605(a)(2), as noted above, is the relevant exception with which we are concerned in this case. In order to determine whether CONASUPO falls within it, we must first ascertain whether the relevant activities in which CONASUPO has engaged are "commercial" as opposed to "governmental." As noted by the court in Outboard Marine Corp. v. Pezetel, 461 F.Supp. 384, 395 (D.Del.1978),

". . . the definition of commercial activity is broad and sweeping. . . . If there were any doubt about the breadth of the statutory language employed, the legislative history instructs that 'the courts would have a great deal of latitude in determining what is a "commercial activity" for purposes of this bill. It has seemed unwise to attempt an excessively precise definition of this term, even if that were practicable.' [H.R.Rep.No.94–1487, [1976] U.S.Code Cong. & Admin. News at 6605.]".

The testimony of Bruno Ristau, former Chief of the Foreign Litigation Section of the Civil Division of the Department of Justice, at the House hearings was that,

"If a government enters into a contract to purchase goods and services, that is considered a commercial activity. It avails itself of the ordinary contract machinery. It bargains and negotiates. It accepts an offer. It enters into a written contract and the contract is to be performed." Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess. 51 (1976). ("1976 Hearings")

As the Court in Texas Trading concluded, "if the activity is one in which a private person could engage, it is not entitled to immunity." 647 F.2d at 309.

CONASUPO's activities as outlined hereinabove clearly qualify as "commercial activity." The purpose of CONASUPO's dealings, which was to effect a stabilization of Mexican price supports, is wholly collateral and irrelevant. 28 U.S.C. § 1603(d); Texas Trading, supra. The nature of its activities was purely commercial. See Trendex Trading Corp. v. Central Bank of Nigeria, 2 W.L.R. 356, 359, 1 All E.R. 881, cited in Texas Trading, supra, 647 F.2d at 310:

" 'If a government department goes into the market places of the world and buys boots or cement—as a commercial transaction—that government department should be subject to all the rules of the market place.' "

Having found that CONASUPO's activities constitute "commercial activity" under § 1603(d), we must now determine whether such activity falls within any of the exceptions to immunity as provided for in §§ 1606–1607. As noted above, § 1605(a)(2) is the focal point. That section provides that a foreign state will not be immune from the jurisdiction of courts of the United States or of any State in any case in which the action is based (1) upon a commercial activity carried on in the United States by the foreign state; or (2) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or (3) upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. Section 1603(e), set forth above, specifies that a "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

■ A sharp dispute exists among the parties herein as to the appropriate forum to be utilized in determining whether a foreign state has had "substantial contact with this country" as per § 1603(d) and § 1605(a)(2). CONASUPO contends that only its contacts with the state of Arkansas may be considered, while Bankers Trust and Worldwide urge that the entire United States (defined in § 1603(c) as including all territory, waters, continental or insular, subject to the jurisdiction of the United States) is the proper forum.

The Court finds that to limit the forum to any particular state would clearly not be in keeping with the intents and purposes of the FSIA. Initially it should be noted that the plain language of the Act itself refers again and again to contact with the *United States*, activity carried on in the *United States*, activity elsewhere which causes a direct effect in the *United States*. There is nothing whatsoever in the wording of the Act to indicate that any one state, as opposed to the whole country, should be utilized as the forum for the purpose of determining jurisdiction.

In holding that the entire United States was the forum intended by Congress in its passage of the FSIA, the Court in *Texas Trading, supra*, 647 F.2d at 312, stated that

"State law abounds with decisions locating 'effects' for personal jurisdiction purposes. But those cases are not precisely on point, for they are concerned more with federalism, and less with international relations, than was Congress in passing the FSIA. [Footnote omitted.]"

The Court further held that, in construing the term "in the United States" as used in the Act, courts

"should be mindful more of Congress' concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign, *House Report* at 6605, than with cases defining 'direct' or locating effects under state statutes passed for dissimilar purposes. Before the FSIA, plaintiffs enjoyed a broad right to bring suits against foreign states, subject only to State Department intervention and the presence of attachable assets. Congress in the FSIA certainly did not intend significantly to constrict jurisdiction; it intended to regularize it. See *House Report* at 6605–6606. The question is, was the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case? No rigid parsing of § 1605(a)(2) should lose sight of that purpose." 647 F.2d at 312, 313.

Other courts which have decided cases brought pursuant to the FSIA have, with one exception which will be discussed below, considered the whole United States as the proper forum. *See*, in addition to *Texas Trading, supra, Gemini Shipping, Inc., v. Foreign Trade Organization for Chemicals*

*and Foodstuffs, et al., supra; Sugarman v. Aeromexico, Inc.,* 626 F.2d 270 (3d Cir. 1980); *Chicago Bridge & Iron Co. v. Islamic Republic of Iran, supra; Decor by Nikkei International, Inc., v. Federal Republic of Nigeria, supra; Verlinden B. V. v. Central Bank of Nigeria,* 488 F.Supp. 1284 (S.D.N.Y.1980), aff'd 647 F.2d 320 (2d Cir. 1981); *Carey v. National Oil Corp., supra; Harris v. VAO Intourist, Moscow, supra; East Europe Domestic International Sales Corp. v. Terra,* 467 F.Supp. 383 (S.D.N.Y.1979), aff'd 610 F.2d 806 (2d Cir. 1979); *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y.1978), aff'd 597 F.2d 314 (2d Cir. 1979); *Outboard Marine Corp. v. Pezetel, supra;* and *Upton v. Empire of Iran,* 459 F.Supp. 264 (D.C.1978).

The Court has found only one instance in which a state, rather than the entire country, was used as the forum. *Waukesha Engine Division, Dresser Americas, Inc., v. Banco Nacional de Fomento Cooperative,* 485 F.Supp. 490 (E.D.Wis.1980). The plaintiff had sued the defendant (a Mexican governmental banking institution) for breach of contract. In ruling upon the defendant's motion to dismiss for lack of jurisdiction, the court discussed only the defendant's contacts with the State of Wisconsin. The analysis followed the pattern used by the Seventh Circuit in *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.,* 597 F.2d 596 (1979), which was a simple diversity action between citizens of different states.

The Court finds that the existence of this one exception to the rule is by no means persuasive. The vast majority of courts which have interpreted the FSIA have considered the entire United States to be the appropriate forum. Moreover, in the *Waukesha* opinion there is nothing to indicate that the issue of which forum should be used was ever even raised; rather, it appears that the parties and the court all assumed without question that the decision should be patterned upon a standard diversity analysis, under which the State of Wisconsin was naturally the focal point.

It is thus the finding of the Court that the relevant forum to be utilized in determining whether jurisdiction exists is the entire United States. Such being the scope of analysis, it is clear that CONASUPO's commercial activity in the United States upon which the complaint and the cross-complaint are based is sufficient to bring it within this Court's jurisdiction pursuant to the first clause of 28 U.S.C. § 1605(a)(2). As set forth in the beginning of this Memorandum Opinion, CONASUPO was involved in the purchase and transportation of massive quantities of commodities from various American companies. To assist it in this endeavor, it engaged the services of Worldwide as its agent to coordinate the movement of the commodities from inland points to Mexico. And to assist it in paying for Worldwide's services, CONASUPO engaged Bankers Trust as its financial agent.

■ It must be remembered that it is not only the activities of the defendant itself in the forum, but also actions relevant to the transaction by an agent on the defendant's behalf, which support personal jurisdiction. *Texas Trading, supra,* 647 F.2d at 314; *Carey v. National Oil Corp., supra,* 592 F.2d at 676, n.7; *East Europe Domestic International Sales Corp. v. Terra,* 467 F.Supp. at 390; *Travis v. Anthes Imperial Ltd.,* 473 F.2d 515 (8th Cir. 1973); *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 120–121 (2d Cir. 1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968); *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 538, 281 N.Y.S.2d 41, 44–45, 227 N.E.2d 851, 854, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967); *Nix v. Dunavant,* 249 Ark. 641, 460 S.W.2d 762 (1970).

■ This is not an instance of either Bankers Trust or Worldwide attempting to claim jurisdiction based solely upon either of their own unilateral activities within the United States, as contended by CONASUPO.[1] Rather, the acts of Worldwide, as

---

1. The Court is well aware of the provisions of *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), that,

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact

agent for CONASUPO, constitute the basis for this Court's jurisdiction over Bankers' claim, and the acts of Bankers, as agent for CONASUPO, provide the jurisdictional basis for Count I of Worldwide's cross-complaint. The actions of CONASUPO, via its agents, were more than "sufficiently within the United States" so that "Congress would have wanted an American court to hear the case." *Texas Trading, supra*, 647 F.2d at 313.

■ It having been determined that CONASUPO is not immune under the FSIA with respect to the complaint and Count I of the cross-complaint, it must now be decided whether CONASUPO's contacts with the United States are such that traditional due process considerations permit suit to be brought here, *i.e.*, whether "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). This standard has been held to involve four separate determinations: (1) the extent to which the defendant availed itself of the privileges of American law; (2) the extent to which litigation in the United States would have been foreseeable to the defendant; (3) the inconvenience to the defendant of litigating in the United States; and (4) the countervailing interest of the United States in hearing the suit. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla, supra; McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *International Shoe Co. v. Washington, supra*.

The facts of this case, set forth hereinabove, clearly establish that CONASUPO, via its agents Worldwide and Bankers, repeatedly and purposefully availed itself of the privilege of conducting activities in this

country. As noted by the court in *Thomas P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica, supra*, 614 F.2d at 1247,

"In analyzing the defendant's activities we must focus upon 'economic reality' rather than a mechanical checklist . . . An enterprise obtains the benefits and protection of our laws if as a matter of commercial actuality it has engaged in economic activity within [the forum]." (Quoting from *Foster v. Mooney Aircraft Corp.*, 68 Cal.App.3d 887, 137 Cal.Rptr. 694 (1977).

Without a doubt, the "economic reality" in the instant case is that CONASUPO was engaged in substantial economic activity in the United States, out of which activity the instant suit arose. It has thoroughly invoked the benefits and protections of American laws. Certainly if CONASUPO had had any claim against either Bankers or Worldwide, the laws of this country would have afforded protection to it and allowed it to sue. Thus the Court finds that the first of the four criteria listed above is satisfied.

The second criterion, whether CONASUPO could have reasonably foreseen that litigation would be instituted against it here, is also met. Due to the extensiveness of the commercial activity which was being conducted here, CONASUPO had every reason to expect to be haled before a court here. *Schaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). The very function of the due process clause is to give "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at 297, 100 S.Ct. at 567. In light of CONASUPO's intentional activities in the United States, litigation was clearly foreseeable.

with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by

which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

As for the third criterion, the Court finds that litigation here is not unduly inconvenient for CONASUPO. The Court has been urged by CONASUPO to dismiss the claims against it under the theory of *forum non conveniens*, citing *inter alia, J. F. Pritchard & Co. v. Dow Chemical of Canada, Ltd.*, 462 F.2d 998 (8th Cir. 1972), and *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). These cases hold that the major considerations to be applied are

"the private interest of the litigant; relative ease of access to sources of proof; the availability of compulsory process on the unwilling and the cost of obtaining the presence of the willing witnesses, documents, etc.; the possibility of viewing the premises involved and 'all other practical problems that make trial of the case easy, expeditious and inexpensive,' such as the enforceability of a judgment once obtained and the relative advantages and obstacles to fair trial." 462 F.2d at 1000.

Any inconvenience encountered by CONASUPO in litigating the claims in this forum would be matched, and probably exceeded, by the inconvenience to the other two parties if the claims were heard in Mexico. Furthermore, due to the volume of business being carried on in this country, the inconvenience of being sued here was at least expected, *Texas Trading, supra*, 647 F.2d at 315, and "any assertion of inconvenience here is belied by defendant's constant resort to the United States for a myriad of services . . ." *Id.* Consequently, the Court finds that the doctrine of *forum non conveniens* should not be adopted in this case.

The last due process determination to be considered is the interest of the United States in hearing this suit. As noted in *Texas Trading, supra*, 647 F.2d at 315, the Supreme Court in *McGee v. International Life Insurance Co., supra*, depended in part on the forum's "manifest interest in providing effective means of redress for its residents . . . 355 U.S. at 223, 78 S.Ct. at 201." The *Texas Trading* court continued,

"Here, we should not be unmindful that Congress has passed the FSIA specifically to provide 'access to the courts.' *House Report* at 6605. Similarly, the plaintiff has an 'interest in obtaining convenient and effective relief.' *World-Wide Volkswagen v. Woodson, supra*, 444 U.S. at 292, 100 S.Ct. at 564, citing *Kulko v. California Superior Court, supra*, 436 U.S. at 92, 98 S.Ct. at 1696." 647 F.2d at 315.

In sum, the Court finds that CONASUPO's relation to the forum here satisfies the due process requirements of *International Shoe Co. v. Washington, supra*, and its progeny.

■ Remaining to be determined is the effect of the forum selection clause in the Worldwide-CONASUPO contract. Such clauses are generally held to be binding unless it appears that the inclusion thereof within the contract was procured by fraud, *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), undue influence, or overweening bargaining power. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The record reflects that in the instant case the contract was negotiated and finalized by persons who were dealing at arms' length and who had extensive business acumen. The fact that Worldwide had already invested a great deal of money in the negotiations prior to learning of CONASUPO's insistence upon the clause, the fact that CONASUPO treated the inclusion of the clause on a "take-it-or-leave-it" basis, or the fact that CONASUPO represented that similar clauses were normally included in its other contracts[2] do not amount to "undue influence" or "overweening bargaining power," let alone outright fraud. The invalidation of this portion of the contract would not only allow Worldwide "to repudiate its solemn promise but would, as well, reflect a 'parochial concept that all disputes must be resolved under our laws and in our courts . . . We cannot have trade and commerce in world markets and international

---

**2.** Documentary evidence introduced at the hearing indicates that the majority, but not all, of CONASUPO's contracts with foreign compa-

nies contain a forum selection clause in favor of the courts of Mexico.

**1112**

waters exclusively on our terms, governed by our laws, and resolved in our courts.'" *Scherk v. Alberto-Culver Co., supra,* 417 U.S. at 519, 94 S.Ct. at 2457, quoting from *M/S Bremen v. Zapata Off-Shore Co., supra,* 407 U.S. at 9, 92 S.Ct. at 1912.

It is thus the finding of the Court that the forum selection clause is binding against Worldwide, but only as to Counts II and III of the cross-claim. Since Count I is inextricably intertwined with the issues presented in Bankers' complaint, the Court will exercise its ancillary jurisdiction so as to encompass Worldwide's claims in the first count. *Coastal Air Lines, Inc., v. Dockery,* 180 F.2d 874 (8th Cir. 1950). See, generally, Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction § 3523. The major purpose of ancillary jurisdiction is to insure that a judgment of a court is given full effect. A secondary, although certainly not unimportant, purpose is that of judicial economy: disputes related to a single dispute should be resolved in the original forum. *Morrow v. District of Columbia,* 417 F.2d 728 (D.C.Cir. 1969); *Dillon v. Berg,* 347 F.Supp. 517 (D.Del.1972). The overriding concern, however, should be to insure that complete justice is done. *Id.; State of Iowa v. Union Asphalt & Roadoils, Inc.,* 281 F.Supp. 391 (S.D.Iowa 1968).

To effect these purposes in a situation such as the one at hand, ancillary jurisdiction should attach where: (1) the ancillary matter arises from the same transaction which was the basis of the main proceeding, or arises during the course of the main matter, or is an integral part of the main matter; (2) the ancillary matter can be determined without a substantial new fact-finding proceeding; (3) determination of the ancillary matter through an ancillary order would not deprive a party of a substantial right; and (4) the ancillary matter must be settled to protect the integrity of the main proceeding or to insure that the disposition of the main proceeding will not be frustrated. *Morrow v. District of Columbia, supra,* 417 F.2d at 740; *Dillon v. Berg, supra,* 347 F.Supp. 517, 519 (D.Del.

1972). Since all four factors are clearly present with respect to the relationship between the complaint and Count I of the cross-claim, jurisdiction will be assumed over the latter despite the forum selection clause in the Worldwide-CONASUPO contract.

For all of the reasons set forth herein, CONASUPO's motion to dismiss Bankers Trust Company's amended complaint is denied. The motion to dismiss Worldwide's cross-claim is granted as to Counts II and III and denied as to Count I.