Salah **TURKMANI**, Plaintiff,

v.

The **REPUBLIC OF BOLIVIA**, Defendant.

No. CIV.A.97–1563(RMU).

United States District Court, District of Columbia.

March 28, 2002.

---

Andrew Neill Vollmer, Wilmer, Cutler & Pickering, Washington, DC, for plaintiff.

Mary Elizabeth Riordan, Reed, Smith, Shaw & McClay, L.L.P., Washington, DC, Michael T. Dyson, Winston & Strawn, Washington, DC, Alan A. D'Ambrosio, Winston & Strawn, New York City, for defendant.

### MEMORANDUM OPINION

URBINA, District Judge.

GRANTING THE PLAINTIFF'S MOTION FOR SUM-
MARY JUDGMENT AND DENYING THE DEFEN-
DANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This Foreign Sovereign Immunities Act case comes before the court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Salah Turkmani ("the plaintiff") seeks damages for an alleged breach of contract by the Republic of Bolivia ("the defendant"). The defendant filed its cross-motion for summary judgment on the ground that it is immune from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA"), as amended 28 U.S.C. §§ 1602 *et seq.*, and, in the alternative, asserts a champerty defense pursuant to Section 489 of the New York Judiciary Law. After consideration of the parties' submissions and the relevant law, the court grants the plaintiff's motion for summary judgment and denies the defendant's motion for summary judgment.

### II. BACKGROUND

#### A. Factual Background

The plaintiff served as the president and director of the Mega Company, and was also the Mega Company's sole shareholder. *See* Pl.'s Mot. For Summ. J. ("Pl.'s Mot.") at 6. In the late 1980s, the Mega Company engaged in the business of purchasing foreign debt from various creditors, including bondholders. *See id.* at 7. The defendant is a foreign state located in South America. *See* Compl. at 3.

In October 1968, the defendant issued more than $67 million in "sinking fund" bonds,[1] with the principal amount of the bonds set to mature on October 1, 1995 ("the bonds"). *See id.* at 2–3. In February 1969, the defendant entered into a Fiscal Agency Agreement with the Bank of New York, whereby the defendant established a sinking fund at the Bank of New York to purchase and redeem the bonds. *See id.* at 3–4.

The Mega Company, through the plaintiff, bought the majority of the bonds at

---

**1.** A sinking fund is "a fund consisting of regular deposits that are accumulated with interest to pay off a long-term debt." *Black's Law Dictionary* 682 (7th ed.1999). A bond is a debt instrument promising to "pay a fixed sum of money, at a definite time, with a stated interest." *Id.* at 169. A sinking fund bond is a bond that is backed by a sinking fund. *See id.* at 174.

issue in this case in August 1995 for 12 percent of their par value.[2] *See* Pl.'s Mot. at 6. The Mega Company made the initial purchases from two different individuals. *See id.* at 6–10. The plaintiff's wife, Chang Oh Turkmani, who served as the general counsel at the Mega Company, brokered each of the deals. *See* Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 6.

The defendant first defaulted on interest payments due on the bonds in 1988. *See* Pl.'s Stat. of Mat. Facts at 14–15. On October 1, 1995, the defendant defaulted on the principal payments. *See id.* Several holders of the Bolivian bonds then instituted a class action against the defendant on October 18, 1995, in *Hirshon v. Bolivia,* 979 F.Supp. 908 (D.D.C.1997). *See id.* at 15. That class-action suit came before Judge Stanley S. Harris of this court. *See Hirshon v. Bolivia,* 979 F.Supp. 908 (D.D.C.1997).

On December 15, 1995, the defendant entered into an agreement with the Paris Club ("the Paris Club Agreement"), a group of creditor governments that formed in 1956 to address restructuring debts with debtor countries.[3] *See* Def.'s Mot. at 3–4. The Paris Club Agreement provides for restructuring of the defendant's external debt based on a payment of 33 percent of the principal amount due, with payments of accrued interest forgiven. *See id.* The United States and the defendant entered into an agreement ("the International Agreement") adopting the Paris Club Agreement on January 23, 1996. *See id.*

After the defendant had already defaulted on paying the interest and principal due on the bonds, the Mega Company purchased additional bonds in October 1996 from a third individual. *See* Def.'s Mot. at 6. Again, the plaintiff's wife brokered the purchase of these bonds. *See id.*

In December 1996, the Mega Company, by a unanimous vote of its board of directors, transferred the bonds to the plaintiff as a year-end bonus for his work performed for the company in 1996. *See* Def.'s Mot. at 7. The board of directors consisted of the plaintiff, the plaintiff's wife, and the plaintiff's brother. *See id.* They set the value of the bonds at $30,000.00. *See id.*

The defendant alleges that the plaintiff and his wife spoke to personnel at the Bolivian Embassy, who informed them that the defendant was already in default of the principal and interest due on the bonds, and made no promise of any payment forthcoming. *See* Def.'s Mot. at 7–8. The plaintiff claims, to the contrary, that the Bolivian Embassy represented that the defendant would honor its debt. *See* Pl.'s Mot. at 9–11. The plaintiff also claims that the bonds were not transferred to him and his wife for the purposes of initiating litigation as prohibited by New York's champerty statute.[4] *See* Pl.'s Mot. at 10–11.

---

**2.** Par value refers to "the value of an instrument or security as shown on its face" and is synonymous with the term "face value." *Black's Law Dictionary* 1145 (7th ed.1999).

**3.** The member countries of the Paris Club Agreement include Austria, Belgium, Denmark, France, Germany, the Netherlands, the United Kingdom, Japan and the United States. *See* Alexis Rieffel, *The Paris Club, 1978–83,* 23 Colum. J. Transnat'l L. 83 (1984).

**4.** New York's champerty statute states that:

... [N]o corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon; ...

N.Y. Jud. Law § 489 (1967); *see also infra* n. 11.

On December 11, 1996, Judge Harris preliminarily approved a proposed settlement in the *Hirshon* class action, conditionally certified a settlement class, and approved a notice to be sent to all known bondholders, including the plaintiff. *See Hirshon*, 979 F.Supp. at 910; Pl.'s Mot. at 11. On February 10, 1997, the plaintiff opted out of the class certified for settlement purposes. *See* Pl.'s Mot. at 11. On April 4, 1997, the *Hirshon* class action entered a settlement, awarding payment of 33 percent of the principal face amount due on the bonds to the remaining class members. *See id.; Hirshon*, 979 F.Supp. at 911. Because the plaintiff did not participate in the 1997 class-action settlement, he now brings this breach-of-contract claim against the defendant seeking his own recovery of damages.

### B. Procedural Background

The plaintiff filed his complaint on July 8, 1997. As stated before, the case was initially assigned to Judge Harris. The plaintiff claims that he bought bonds with an aggregate face value of $220,211.75 and interest coupons worth $46,101.00. *See* Compl. at 6. As such, he seeks damages of at least $266,312.75 plus attorneys' fees.[5]

The parties filed cross-motions for summary judgment on September 4, 1998. The defendant asserts, among other things, the defenses of sovereign immunity and champerty. *See* Answer at 1. On March 15, 2001, the case was reassigned to the below-signed member of the court, Ricardo M. Urbina.

On June 4, 2001, the plaintiff renewed his motion for summary judgment. On June 11, 2001, the defendant renewed its motion for summary judgment. Accordingly, the parties' cross-motions for summary judgment are now fully briefed and ripe for resolution. For the reasons that follow, the court grants summary judgment for the plaintiff and denies summary judgment for the defendant.

### III. ANALYSIS

#### A. Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party

---

**5.** In his motion for summary judgment, the plaintiff also moved for attorneys' fees pursuant to 28 U.S.C. § 1927. The court need not address this issue in order to resolve the dispute presented in this case. The court only reaches a resolution on the merits of the plaintiff's claim in this disposition.

"fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See Greene,* 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

## B. The FSIA Does Not Preclude the Plaintiff's Claim

When the court addresses a suit against a foreign state, the court must initially determine whether it has subject-matter jurisdiction to hear the case. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The FSIA provides the sole basis for jurisdiction over suits against foreign nations. *See id.*

The FSIA presumes that foreign states are immune from the jurisdiction of United States courts. *See* 28 U.S.C. § 1604. Exceptions to this immunity exist for cases dealing with waiver of immunity, certain commercial activities, expropriation of certain types of property, cases concerning rights to immovable property situated in the United States, and actions based in tort, or admiralty claims. *See* 28 U.S.C. §§ 1605(a)(1)-(5),(b).

In the present case, the defendant argues that because the facts giving rise to the plaintiff's cause of action took place before the enactment of the FSIA, the court lacks subject-matter jurisdiction over the instant case because the FSIA may not apply to the defendant retroactively. *See* Def.'s Mot. at 11. The plaintiff contends that the FSIA applies to this case and, furthermore, that the defendant's actions, which are the subject of this lawsuit, are commercial activities that are exempt from the FSIA's sovereign-immunity status pursuant to 28 U.S.C. § 1605(a)(2). *See* Pl.'s Mot. at 24. The court addresses these arguments in turn.

### 1. The FSIA Applies to Post– 1952 Commercial Acts by a Foreign Sovereign

The court must first determine whether the FSIA applies to the plaintiff's claim and thereby ascertain whether subject-matter jurisdiction exists. Since the founding of the nation to the latter half of the twentieth century, foreign sovereigns enjoyed absolute immunity from suit in United States courts. *See e.g., The Schooner Exchange v. McFaddon,* 11 U.S. 116, 137–38, 7 Cranch 116, 3 L.Ed. 287 (1812); *see also Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (explaining the history of sovereign immunity in the United States). During that time, courts deferred to the decisions of the Executive branch on whether to exert jurisdiction over actions against foreign sovereigns and their instrumentalities, and, as a matter of grace and comity on the part of the United States, the State Department generally requested immunity in all actions against friendly foreign sovereigns. *See Verlinden,* 461 U.S. at 486, 103 S.Ct. 1962.

In 1952, the Tate Letter announced the Executive branch's adoption of the "restrictive theory" of immunity with respect to claims against foreign sovereigns. *See* Letter from Jack B. Tate, Acting Legal

Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dept. of State Bull. 984–985 (1952), *and in Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 712–13, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Under the restrictive theory of immunity, foreign states and their instrumentalities retained immunity for their sovereign or public acts, but could be sued in United States courts for their commercial or private acts. *See Verlinden*, 461 U.S. at 486–87, 103 S.Ct. 1962.

Even with Congress' enactment of the FSIA in 1976, courts continued to defer to recommendations from the State Department on a case-by-case basis in determining sovereign immunity. *See id.* at 487, 103 S.Ct. 1962. The possibility existed that political considerations, rather than purely legal considerations, could determine whether or not foreign sovereigns obtained immunity from suit in United States courts. Only when the Executive branch remained silent did the courts determine whether sovereign immunity would be extended in suits involving foreign states. *See id.* In sum, the "governing standards were neither clear nor uniformly applied." *Id.*

The 1976 FSIA substantially codified the restrictive theory of sovereign immunity in order to "free the Government from the case-by-case diplomatic pressures," to assure litigants that "decisions are made on purely legal grounds," and to "insure that [the] restrictive principle of immunity is applied in litigation before U.S. courts." *H.R.Rep. No. 94–1487* at 7 (1976).

#### a. The Underlying Acts That Gave Rise to the Plaintiff's Instant Claim Occurred in 1968

The defendant asserts that the relevant dates underlying the plaintiff's claim against it are 1917, 1922, 1927, and 1928, the time period in which the defendant issued "the original" bonds, thereby rendering the bonds at issue in this case as mere substitutes. *See* Def.'s Mot. at 11. According to the defendant, because the issuance of the 1968 bonds must be subject to the law applicable at the time of the issuance of the original bonds, absolute sovereign immunity must apply to this case. *See id.*

The plain language and terms of the bonds suggest otherwise. The defendant publicly announced the issuance of the bonds in February 1969. *See* Pl.'s Stat. of Mat. Facts at 4. The offer described the bonds as "new bonds" and stated that the defendant would issue the "new bonds" in exchange and substitution for bonds that the defendant had issued in 1917, 1922, 1927, and 1928. *See id.* at 4–5. The 1968 bonds have different interest rates, different denominations, different payment terms from the earlier bonds, and the terms of the 1968 bonds do not depend on or incorporate the terms of the earlier bonds. *See id.* at 5.

It is axiomatic that the law existing at the time that a contract is made determines the rights of a party to that contract. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) (explaining that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place"). "Not only are existing laws read into contracts in order to fix obligations as between parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." *Jackson v. People's Republic of China*, 596 F.Supp. 386, 388 (N.D.Ala.1984).

Applying these principles to the facts in the instant case, the court concludes that the bonds issued in 1968 assumed a new set of contractual obligations governed by the law in effect at that time, and not the

law governing the obligations of older bonds. *See Jackson,* 596 F.Supp. at 388. Indeed, the defendant itself states that it "decided to *discharge and replace* its obligations under [the] earlier bonds by issuing the 1968 bonds." Def.'s Reply Mem. in Further Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") at 5 (emphasis added). Therefore, the court examines the question of whether the FSIA applies to the plaintiff's claim by looking to the practice of granting foreign sovereigns immunity in United States courts at the time the defendant issued the bonds in 1968. *See id.; Jackson,* 596 F.Supp. at 388.

### b. The FSIA Applies to the Defendant's Issuance of °the 1968 Bonds

 The defendant asserts that it is entitled to absolute immunity, notwithstanding the determination that the underlying acts or events giving rise to this matter occurred in 1968, because in either case the FSIA does not apply retroactively with respect to bonds issued before the FSIA's 1976 effective date. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n") at 10–12; *Landgraf v. USI Film Prods.,* 511 U.S. 244, 272, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (stating that "statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact").

Courts have held that the FSIA cannot apply retroactively to foreign debt defaults prior to the publication of the Tate Letter in 1952. *See, e.g., Jackson,* 794 F.2d 1490 (stating that the FSIA does not apply to Chinese bonds issued in 1911 by the Imperial Government of China); *Slade v. Mexico,* 617 F.Supp. 351, 356 (D.D.C.1985) (stating that the FSIA does not apply to Mexico's default on notes receivable to the extent that "all the operative events occurred before 1952"). These cases, however, do not address the applicability of the FSIA to activities of foreign sovereigns prior to the enactment of the FSIA, but subsequent to the Tate Letter. *See id.*

The Second Circuit has concluded that the FSIA does not apply to default on Russian bonds issued in 1916, but has implied that the Act would apply to commercial causes of action arising between 1952 and the enactment of the FSIA in 1976. *See Carl Marks & Co. v. Union of Soviet Socialist Republics,* 841 F.2d 26, 27 (2d Cir.1988) (finding that "only after 1952 was it reasonable for a foreign sovereign to anticipate being sued in United States courts on commercial transactions").

The D.C. Circuit developed the rule further in *Princz v. Federal Republic of Germany,* 26 F.3d 1166 (D.C.Cir.1994), suggesting that a blanket retroactive application of the FSIA is proper. *See id.* at 1170. The D.C. Circuit reasoned that "the implication is strong that all questions of foreign sovereign immunity, including those that involve an act of a foreign government taken before 1976, are to be decided under the FSIA." *Id.* (citing *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 851 n. 1 (S.D.N.Y.1978) (holding that application of the FSIA to actions commenced before the Act's effective date is proper)).

Although the D.C. Circuit decided *Princz* without holding that the FSIA applied retroactively, the court discussed retroactive application of the Act at length. *See Princz,* 26 F.3d 1166. In support of the view that retroactive application of the FSIA is proper, the D.C. Circuit noted the language of the FSIA stating that "claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." *Id.* at 1170 (quoting 28 U.S.C. § 1602). The D.C. Circuit interpreted the language of 28 U.S.C. § 1602 as evidence

of Congress's intent that "the FSIA be applied to all cases decided after its enactment, regardless of when the plaintiff's cause of action may have accrued." *Id.*

In addition, when Congress enacted the FSIA, Congress "deleted from 28 U.S.C. § 1332 the provision for diversity jurisdiction over suits brought by a United States citizen against a foreign government." *Id.* at 1170. The D.C. Circuit deduced that it was unlikely that Congress "intentionally but silently denied a federal forum for all suits against a foreign sovereign arising under federal law that were filed after the enactment of the FSIA but based upon pre-FSIA facts." *Id.* Accordingly, the D.C. Circuit reasoned that Congress intended the FSIA to apply retroactively. *See id.*

Caselaw subsequent to the D.C. Circuit's decision in *Princz* relies on *Princz* for the rule that the FSIA applies retroactively. For example, in *Crist v. Republic of Turkey*, 995 F.Supp. 5 (D.D.C.1998), this court considered the *Princz* decision and a plain reading of the statutory language of the FSIA and concluded that "Congress intended the FSIA to be applied retroactively." *See id.* at 9; *Altmann v. Republic of Austria*, 142 F.Supp.2d 1187, 1201 (C.D.Cal.2001) (determining that the FSIA applies retroactively to pre–1952 events); *Haven v. Republic of Poland*, 68 F.Supp.2d 943, 945 (N.D.Ill.1999) (same).

In support of its position, the defendant cites to *Lin v. Japan*, 1994 WL 193948, 1994 U.S. Dist. LEXIS 6061 (D.D.C.1994) (Green, J.H., J.), to stand for the proposition that the FSIA cannot apply retroactively. *See* Def.'s Mot. at 17. Nevertheless, the *Lin* court limited its holding to pre–1952 events, noting that *"before the Tate Letter and the FSIA, ... the plaintiffs would have had no cause of action in a United States court." Lin,* 1994 WL 193948, at *2 n. 4, 1994 U.S. Dist. LEXIS 6061, at *8 n. 4 (emphasis added), 1994

WL 193948, at *2 fn. 4. Accordingly, the defendant's reliance on *Lin* is misplaced. The defendant's claim that it is entitled to absolute sovereign immunity because "it was far from certain that a foreign state would not enjoy sovereign immunity for acts of a commercial nature that occurred between the issuance of the Tate Letter in 1952 and the enactment of the FSIA in 1976" confuses the substantive rules of immunity with the procedure for applying them. *See* Def.'s Opp'n at 16.

Lack of certainty with respect to a foreign sovereign's amenability to suit for its commercial acts post–1952, resulting from the courts' practice of deferring to the State Department's recommendations of immunity, should not be confused with the absolute immunity granted prior to 1952. *See Princz*, 26 F.3d at 1170–71 (holding that application of the FSIA to atrocities committed by Germany during World War II "may not even count as 'genuinely retroactive'" because doing so would "not alter Germany's liability under the substantive law in force at the time, i.e., it would just remove the bar of sovereign immunity [for] the plaintiff [to] vindicat[e] his rights under that law").

No "genuine" retroactivity exists by applying the FSIA to post–1952 commercial acts by a sovereign government. *See Princz* at 1170 (stating that "only a statute that 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed' is truly retroactive.") (quoting *Landgraf*, 511 U.S. at 277, 114 S.Ct. 1483). As the D.C. Circuit observed in *Gilson v. Republic of Ireland*, 682 F.2d 1022, (D.C.Cir.1982):

"While [the] FSIA was by all accounts an important piece of legislation, it is a great exaggeration to say that the plaintiff was without remedy before it became effective .... It may be true ...

that the Act curtailed the possibility of the Department of State intervening here with its own plea of sovereign immunity for defendants, removed certain procedural obstacles, and increased the property available to the plaintiff for judgment. But to say that any action was effectively barred before the FSIA is not true."

*Id.* at 1025 (citations omitted). The D.C. Circuit went on to hold that the FSIA applies to a foreign sovereign's activities commenced before the Act's 1977 effective date.[6]

While this court does not adopt a *per se* rule with respect to the blanket retroactive application of the FSIA, the court recognizes that "the policy supporting the restrictive view of immunity... is to assure those engaging in *commercial transactions* with foreign sovereignties that their rights will be determined in the courts *whenever possible.*" *Alfred Dunhill of London, Inc.*, 425 U.S. at 699, 96 S.Ct. 1854 (emphasis added).

The greater weight of authority favors the plaintiff's position. Accordingly, the court concludes that the *commercial activity* exception, embodied in the restrictive theory of sovereign immunity and codified by the FSIA, applies to events occurring after the Tate Letter in 1952. *See* 28 U.S.C. § 1605. Accordingly, the court concludes that the FSIA applies to the instant case and does not bar the plaintiff's cause of action.[7]

### 2. The FSIA's Commercial Activity Exception Applies to the Instant Action

As noted earlier, under the FSIA, foreign states are immune from the jurisdic-

tion of United States courts unless one of a limited number of exceptions applies. *See* 28 U.S.C. § 1604. Among these exceptions is the so-called "commercial activity" exception. *See* 28 U.S.C. § 1605(a)(2). There is a two-part analysis to determine whether the FSIA allows a United States court to exercise jurisdiction over a foreign sovereign in the context of the commercial activity exception. *See Virtual Defense and Dev. Int'l, Inc. v. Republic of Moldova*, 133 F.Supp.2d 1, 2 (D.D.C.1999). First, it is necessary for the court to determine whether the activity at issue is a commercial activity for purposes of the FSIA. *See id.* If the activity is not "commercial," then the FSIA precludes this court from exercising jurisdiction over the case. *See id.* On the other hand, if the activity is "commercial," then the court must determine whether there is a sufficient nexus between the commercial activity and the United States. *See id.*

### a. The Issuance of the Bonds by the Defendant Constitutes Commercial Activity Under the FSIA

■ Turning to the first part of the FSIA jurisdictional analysis, "[w]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *see also Verlinden B.V.*, 461 U.S. at 488, 103 S.Ct. 1962 (stating that when the commercial exception applies "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"). In addition, 28 U.S.C. § 1602

---

**6.** The FSIA, enacted in 1976, went into effect on January 19, 1977. *See Gilson*, 682 F.2d at 1023 n. 1.

**7.** The plaintiff argues that both the commercial activity and waiver of immunity excep-

tions apply to the defendant's actions in this case. *See* Pl.'s Mot. at 19–24. Because the court recognizes that the defendant's actions constitute a commercial activity for purposes of the FSIA, the court need not address the waiver exception.

states the well-established maxim of international law that "states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned." 28 U.S.C. § 1602.

The Supreme Court's decision in *Weltover* addresses the commercial nature of foreign debt instruments issued in the United States. *See Weltover,* 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394. In *Weltover,* Argentina defaulted on bonds issued in 1982 that matured in 1986. *See id.* The Court determined that the commercial character of the bonds "are in almost all respects garden-variety debt instruments" because they "may be held by private parties[,] ... are negotiable[,] ... may be traded on the international market[,] ... and they promise a future stream of cash income." *Id.* at 615, 112 S.Ct. 2160. The Court further noted "that private parties regularly issue bonds ... to raise capital or to finance purchases, [and] also to refinance debt," and thereby concluded that Argentina's issuance of the bonds constituted a "commercial activity" that falls under the ambit of the FSIA. *Id.*

Similar to the facts in *Weltover,* the defendant here issued the bonds to replace previously issued bonds already in default. *See* Def.'s Mot. at 3. The new bonds promised future interest payments and could be held, negotiated for, and traded by private parties. *See* Def.'s Stat. of Mat. Facts at 2. Indeed, the record here shows that the bonds were actively traded by the plaintiff and other private parties. *See id.* at 5–7. In light of these facts, the court concludes that the bonds in the present case, like those in *Weltover,* are "garden-variety" debt instruments of a commercial nature. *See Weltover,* 504 U.S. at 615, 112 S.Ct. 2160. Accordingly, the issuance of the bonds constitutes commercial activity under the FSIA. *See id.; Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1018 (2d Cir.1991) (stating that "it is self-evident that issuing a public debt is a commercial activity within the meaning of Section 1605(a)(2)") (citations omitted).

**b. The Defendant's Activities Underlying the Present Claim Demonstrate That a Nexus Exists Between those Commercial Activities and the United States in Order for the Court to Exercise Jurisdiction Over the Defendant**

██ The court now turns to the second part of the FSIA jurisdictional analysis to determine whether there is a sufficient nexus between the defendant's activities and the United States such that this court may exercise jurisdiction. *See Weltover,* 504 U.S. at 617–18, 112 S.Ct. 2160. To demonstrate a sufficient nexus, the plaintiff must show that the foreign state's actions in question satisfy one of the following three clauses listed in the commercial activity exception to the FSIA:

> the action is based (1) upon a commercial activity carried on in the United States by the foreign state; or (2) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or (3) upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The defendant hardly contends that its actions are not commercial activities carried on in the United States. *See* Pl.'s Mot. at 23. Instead, the defendant asserts only that the court lacks personal jurisdiction over the defendant. *See* Def.'s Answer at 5. The defendant then advances no arguments or analysis to support its position. *Weltover* instructs, however, that "by issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that city," a defendant

"purposefully avail[s] itself of the privilege of conducting activities within the United States." *See Weltover,* 504 U.S. at 619–20, 112 S.Ct. 2160 (citations omitted).

In light of the fact that the defendant issued bonds in New York City, among other factors that identically correspond to those named by the Supreme Court in *Weltover,* the defendant's activities constitute commercial activity *carried on in the United States* by a foreign state, thereby satisfying the first clause delineated in the nexus requirement of the FSIA's commercial activity exception.[8] *See Weltover* at 619–20, 112 S.Ct. 2160. Accordingly, the court concludes that a sufficient nexus between the alleged commercial activity and the United States exists for the court to exercise jurisdiction over the defendant in this matter. *See id.*

## C. New York's Champerty Statute Does Not Bar the Plaintiff's Claim

■ The court next examines the defendant's argument that, even if the defendant is not immune from the court's jurisdiction, the New York Judiciary Law's champerty statute[9] bars the plaintiff's claim. The statute forbids the assignment or acquisition of a "thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Jud. Law § 489 (1967).[10]

### 1. Choice of Law

■ As a threshold matter, the court must first decide whether New York's champerty law applies to the case before the court. The FSIA does not include an express choice of law provision. *See* 28 U.S.C. § 1606. Instead, the FSIA provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* As a result, state substantive law is generally controlling in FSIA cases. *See Barkanic v. Civil Aviation Admin. of the People's Republic of*

---

8. Even under the third clause of the commercial activity test, the defendant's activities in issuing the bonds constitute a sufficiently "direct" nexus in order for the court's jurisdiction to attach. *See, e.g. Weltover,* 504 U.S. at 618–19, 112 S.Ct. 2160 (finding a "direct nexus" where the defendant sovereign "had designated their accounts in New York as the place of payment ... before announcing that it was rescheduling the payments ..." because "money that was supposed to have been delivered to a New York bank for deposit was not forthcoming"); *Shapiro,* 930 F.2d at 1018–19 (stating that "the activity in question ... introduced negotiable promissory notes into the United States for the purpose of raising capital" and "no theory [exists] that would ... allow a foreign state to issue bearer notes to an intermediary in the United States and then to deny that it was engaged in a commercial activity").

9. Champerty is defined as "the act or fact of maintaining, supporting, or promoting another person's lawsuit." *Black's Law Dictionary* 224 (7th ed.1999).

10. The plaintiff asserts that the defendant waived its champerty defense by failing to raise the defense in its answer. *See* Pl.'s Suppl. Mem. in Supp. of Pl.'s Mot. for Summ. J. at 2. The defendant argues that it raised the defense in its answer by asserting the defense of "waiver and estoppel." *See* Def.'s Reply at 7. In the alternative, the defendant seeks leave to file a motion to amend its answer with the champerty defense pursuant to Federal Rule of Civil Procedure 15(a). The court is satisfied that allowing the defendant to do so would not prejudice the plaintiff because the merits of the defendant's champerty defense have been fully addressed in connection with the instant cross-motions for summary judgment. In addition, the court notes that § 489 is a criminal statute, and that public policy weighs against the waiver of criminal statutes. *See Elliott Assocs., L.P. v. Peru,* 12 F. Supp.2d 328, 335–58 (S.D.N.Y. 1998) (holding that § 489 cannot be contractually waived), *rev'd on other grounds,* 194 F.3d 363 (2d Cir.1999).

*China,* 923 F.2d 957, 959 (2d Cir.1991) (citation omitted).

In the present case, the Fiscal Agency Agreement relating to the bonds at issue provides, among other things, that "[t]his Agreement and each and every provision thereof shall be construed and interpreted in accordance with the [l]aws of the State of New York." *See* Def.'s Mot. at 3. Even if the court concludes that the agreement's choice of law provision is not controlling, the court would apply the law of the jurisdiction with the most significant relationship to the parties and the transaction, *see Koro Co. v. Bristol–Myers Co.,* 568 F.Supp. 280, 286 (D.D.C.1983), which would also be New York.

In determining which jurisdiction has the most significant relationship to the parties and the subject transaction, the court considers various factors such as the place of contracting, the place of negotiation of the contract, the place and performance of the contract, the location of the subject matter of the contract, the place of incorporation, and the place of business of the parties. *See Koro Co.,* 568 F.Supp. at 286. The proffered facts reveal that the bonds were issued in New York City and were to be presented to the Bank of New York in New York City for payment from a sinking fund created and maintained in New York City. *See* Pl.'s Stat. of Mat. Facts at 3–4. In addition, the Bank of New York in New York City was appointed as fiscal agent for the payment of principal and interest on the bonds, as well as the sinking fund agent for the bonds. *See id.* Furthermore, the bonds were redeemable on publication of notice in New York City. *See id* at 7. As alluded to earlier, these facts clearly demonstrate that the State of New York has the most significant relationship to the parties and the subject transaction. As such, the laws of the State of New York apply in connection with the

defendant's champerty defense. *See Koro Co.,* 568 F.Supp. at 286.

### 2. The Defendant's Champerty Defense

Section 489 of the New York Judiciary Law sets forth the defense of champerty and provides in relevant part as follows:

> ... [N]o corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon ...

N.Y. Jud. Law § 489 (1967).

New York's champerty statute serves to "prevent the resulting strife, discord and harassment which could result from permitting ... corporations to purchase claims for the purpose of bringing actions thereon ...." *Elliott Assocs. v. Panama,* 975 F.Supp. at 339 (citations omitted). A plaintiff "who acquires a claim in violation of this provision may not recover on the claim, for assignments made in violation of section 489 are void." *Id.* In order to successfully raise the defense of champerty, a defendant must establish that at the time of the purchase of a "thing in action," the primary purpose of the acquisition was to enable the purchaser to bring a lawsuit. *See Banque de Gestion v. La Republica de Paraguay,* 787 F.Supp. 53, 56 (S.D.N.Y. 1992).

The court narrowly construes the champerty statute. *See Bluebird Partners, L.P. v. First Fidelity Bank,* 94 N.Y.2d 726, 709 N.Y.S.2d 865, 731 N.E.2d 581 (N.Y.2000). In *Bluebird Partners,* the New York Court of Appeals observed that the "conventional notion of champerty," rooted in medieval land tenure practices,

may prove archaic "in the modern setting of sophisticated financial transactions and complicated investment strategies." *Id.* at 734, 709 N.Y.S.2d 865, 731 N.E.2d 581.[11] Hence, when interpreting the statute, the court must follow a "prudent approach" that is "consistent with the limited scope of the champerty doctrine as it originally appeared and developed in the Anglo–American legal system." *Id.* at 734–35, 709 N.Y.S.2d 865, 731 N.E.2d 581; *see also Elliott Assocs. v. Panama,* 975 F.Supp. at 340 (observing that section 489 is a criminal statute that must be narrowly construed).

The "critical inquiry is whether the assignment was made for the *exclusive purpose* of bringing an action on the claim." *Koro Co.,* 568 F.Supp. at 287; *Bluebird Partners,* 94 N.Y.2d at 736, 709 N.Y.S.2d 865, 731 N.E.2d 581 (stating that section 489 "requires that the acquisition be made with the intent and for *the* purpose (as contrasted to *a* purpose) of bringing an action or proceeding") (emphasis in the original).

■ The defendant argues that evidence shows that the plaintiff purchased the bonds and certificates of debt with the purpose and intent of bringing this lawsuit to recover the principal amount of the bonds and accumulated interest. *See* Def.'s Mot. at 20–21. First, the defendant states that when the Mega Company, through the plaintiff and his wife, purchased the bonds in August 1995 from individual creditors at 12 percent par value, the Mega Company did so with the knowledge that the defendant had been in default in the payment of interest, and was aware that the maturity date was less than two months away. *See id.* at 20. The defendant alleges that the steep discount is evidence of the plaintiff's knowledge that the bonds would not be paid in full. *See id.* at 21.

Even accepting the defendant's allegations as true, the plaintiff's understanding that payment in full might not be forthcoming falls short of imputing the exclusive intent to sue that the champerty statute prohibits. *See Elliott Assocs. v. Panama,* 975 F.Supp. at 340. In *Elliott Assocs. v. Panama,* the plaintiff investment fund purchased Panamanian sovereign debt. *See id.* Because foreign debt "is actively traded in the market," the court found that when the plaintiff investment fund bought the notes, the "possibility that it would retrade them" existed. *See id.* In addition, the possibilities existed that the economy of the debtor nation would improve, and as a result, the

---

11. As explained by the New York Court of Appeals:

The "champerty" concept is based on a type of French feudal tenure in land, a "champart," in which the fee for use of the land was neither in money nor ordinary service in kind. The tenant-by-champart was a partial owner of the land bound to share any rents and profits with the grantor, but the grantor took the risk that the crops might fail and that there would be no return. Anyone who obtained a legal interest in that grant of land would also take a share of the profits in champart. "Champerty," as a term of art, grew out of this practice to describe the medieval situation where someone bought an interest in a claim under litigation, agreeing to bear the expenses but also to share the benefits if the suit succeeded . . . .

Even as the feudal system faded, English law retained the word "champart" as a metaphor to indicate a disapproval of lawsuits brought "for part of the profits" of the action. Because lawyers were usually the instruments of such practices, "champertors were nearly always lawyers." Indeed, early New York cases indicate that the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs . . . .

*Bluebird Partners,* 94 N.Y.2d at 734, 709 N.Y.S.2d 865, 731 N.E.2d 581 (citations omitted).

debtor nation would have the ability to repay the debt in full *or* at a discount that the plaintiff investment fund would find acceptable. *See id.* This court cannot conclude that these possibilities did not exist with respect to the Mega Company's purchase of the bonds at issue. In fact, the record shows that the plaintiff continued to believe that the defendant would ultimately pay the amounts due on the bonds despite the defendant's previous defaults. *See* Pl.'s Mot. at 18.

The defendant further argues that actions by the plaintiff and statements from his wife taken at a deposition demonstrate the plaintiff's intent to sue. *See* Def.'s Reply at 12. According to the defendant, the plaintiff never evidenced a willingness to accept anything less than 100 percent of the bonds' face value. *See id.* To support its position, the defendant alleges that the plaintiff sent a letter to the defendant, stating that unless the defendant paid in full, the plaintiff would seek "legal remedies in an appropriate court of law." *See id.* In addition, the plaintiff's wife stated during her deposition that "I want my money and that's the end of it." *See id.*

In order to prove champerty, however, the defendant must show that the "foundational intent to sue on the claim must at least have been the primary purpose for, if not the sole motivation behind, *entering* into the transaction." *Bluebird Partners,* 94 N.Y.2d at 736, 709 N.Y.S.2d 865, 731 N.E.2d 581 (emphasis added). A subsequent decision to sue "cannot automatically become synonymous with champerty, for litigation can be an appropriate and commonly used strategy." *Id.* at 734, 709 N.Y.S.2d 865, 731 N.E.2d 581. Since the late 1980s, the Mega Company engaged in the business of acquiring foreign sovereign debt for investment purposes. *See* Pl.'s Mot. at 7. The Mega Company had a legiti-

mate business purpose in purchasing the debt. *See Elliott Assocs. v. Panama,* 975 F.Supp. at 340 (finding a "legitimate business purpose" behind the plaintiff's acquisition of bonds).

In *Elliott Assocs., L.P. v. Banco de la Nacion,* 194 F.3d 363 (2d Cir.1999), the same plaintiff investment fund that brought the action in *Elliott Assocs. v. Panama* purchased distressed Peruvian bonds at a discount. *See id.* When Peru defaulted on those bonds, the plaintiff investment fund made a demand for payment. *See id.* The Second Circuit addressed the difference between the investments in securities for legitimate business purposes and the purchases of securities with the "primary intent to sue." *See id.* The Second Circuit found that the plaintiff investment fund's letter of demand subsequent to default on payments by the foreign debtor and testimony that "Peru would either ... pay us in full or be sued" did not demonstrate "the primary intent to sue" prohibited by New York's champerty statute, but merely demonstrated an "incidental and contingent" intent to sue if Peru did not pay in full. *See id.* at 379. The Second Circuit concluded that although the plaintiff investment fund "knew Peru would not, under the circumstances, pay in full," that knowledge did not make the plaintiff investment fund's intent to sue "any less contingent." *See id.* Indeed, the "acquisition of a debt with intent to bring suit against the debtor is not a violation of the statute where ... the primary purpose of the suit is the collection of the debt acquired." *Id.* Thus, New York's champerty statute is not violated where a plaintiff's primary goal is the satisfaction of a valid debt, and the plaintiff's intent is only to sue absent full performance. *See id.*[12]

---

**12.** The court again notes that the champerty statute applies narrowly in the context of "the

Similar to the facts in *Banco de la Nacion,* at the time the Mega Company acquired the bonds at issue, the plaintiff believed that the defendant would ultimately honor its debt. *See* Pl.'s Mot. at 18. When the plaintiff subsequently acquired the bonds as compensation for his services rendered to the Mega Company, he acquired all associated rights, title, and interest on the bonds, and not merely the right to sue. *See Elliott Assocs. v. Panama,* 975 F.Supp. at 339 (concluding that a transaction is not champertous where all legal rights to debt instruments are transferred in their entirety). The plaintiff then initiated this action after making demand on payment due on the bonds and after the defendant's failure to make those payments. *See* Def.'s Reply at 12. In sum, the court cannot conclude on this record that the plaintiff acquired the bonds for consideration only to engage in litigation. *See Elliott Assocs. v. Panama,* 975 F.Supp. at 340.

Finally, the defendant asserts that the plaintiff removed himself from the class certified for settlement purposes in *Hirshon v. The Republic of Bolivia,* 979 F.Supp. 908 (D.D.C.1997), which would have provided him with a payment of 33 percent of the principal value of the bonds, in order to bring this action. *See* Def.'s Mot. at 21. This assertion implies that the initial participation by the plaintiff in the class settlement was pretextual because a creditor-plaintiff has the right to withdraw from settlements or participation in voluntary debt restructuring. *See Allied Bank International v. Banco Credito Agricola*

*de Cartago,* 757 F.2d 516 (2nd Cir.1985). The defendant further argues that because the Mega Company acquired the bonds for 12 percent par value, the plaintiff's refusal to accept a 33 percent settlement, a "substantial profit," imputed the primary intent to bring suit. *See* Def.'s Mot. at 21.

In response to the defendant's allegations, the plaintiff states that he opted out of the class settlement because he found the terms of the settlement unacceptably low. *See* Pl.'s Mot. at 11. The plaintiff states that of the 33 percent awarded in the class settlement, 25 percent went to the payment of attorneys' fees. *See* Pl.'s Stat. of Mat. Facts at 15. In other words, under the terms of the settlement, the plaintiff actually stood to recover eight percent of the principal value of the bonds. Because the Mega Company originally purchased the bonds at 12 percent par value, the plaintiff would thereby sustain a four percent loss. *See id.* In a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A reasonable factfinder could easily conclude that the plaintiff had a legitimate reason for rejecting the terms of the settlement.

After weighing the various arguments, the court concludes that even if all the defendant's allegations are true, they do not require the court to determine that, at the time the Mega Company acquired the bonds, the plaintiff had the exclusive intent to sue prohibited by New York's champerty statute. *See Banco de la Nacion,* 194

---

modern setting of sophisticated financial transactions and complicated investment strategies" in keeping with the policy not to "cast the potentiality of a champerty cloud too easily over modern business practices and dispute resolutions involving the acquisition of securities and their concomitant rights." *Bluebird Partners,* 94 N.Y.2d at 734–37, 709 N.Y.S.2d 865, 731 N.E.2d 581; *Banco de la*

*Nacion,* 194 F.3d at 380 (stating that the increased risks in debt trading that would result from an expansive reading of the champerty statute "are particularly onerous because the intent [to sue prohibited by the champerty statute] is not always readily ascertainable by the seller, and can only be conclusively resolved by *ex post facto* litigation").

F.3d at 378–79. In addition, the court concludes that the plaintiff has presented specific facts that would enable a reasonable jury to find in its favor. *See Greene,* 164 F.3d at 675. Because the facts here do not support the defense of champerty as a matter of law, the court denies summary judgment with respect to the defendant's champerty defense. *See Banco de la Nacion,* 194 F.3d at 378; *Elliott Assocs. v. Panama,* 975 F.Supp. at 340–41.

### 3. The Paris Club Agreement

 Courts have found a breach of contract where foreign states have defaulted on loan agreements. *See Elliott Assocs. v. Banco De La Nacion,* 12 F.Supp.2d 328, 344 (S.D.N.Y.1998) (citing *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516 (2d Cir.1985); *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850 (2d Cir.1997)), *rev'd on other grounds,* 194 F.3d 363 (2d Cir.1999). Finally, the court considers the defendant's argument that the Paris Club Agreement and International Agreement limit the amount of damages that the plaintiff may recover on his breach-of-contract claim and disagrees with this line of thought. The court concludes that the defendant breached its contract with respect to the bonds at issue when the defendant defaulted in the interest payments and principal due on the bonds. Accordingly, the court grants the plaintiff's motion for summary judgment and denies the defendant's motion for summary judgment with respect to the breach of contract claim.

The Second Circuit has noted that although creditors who consent to a Brady Plan are bound by the negotiated terms, "the other creditors are under no such obligations to accept those terms." [13] *Ban-*

*co de la Nacion,* 194 F.3d at 379. While the United States has a strong interest in the success of debt-restructuring programs, the United States also "has a strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to U.S. lenders." *Id.* The Second Circuit stated that it would "not condemn [the plaintiff]" because the plaintiff chose to "stand apart from the lenders who had agreed to the [debt] restructuring, and to use the judicial process to compel full payment" *Id.* at 376.

In reversing the district court's findings of fact for champerty, the Second Circuit also weighed policy considerations:

> While the district court's rule might benefit the Debtors in the short run, the long term effect would be to cause significant harm to [the debtor nation] and other developing nations and their institutions seeking to borrow capital in New York. The district court's interpretation would mean that holders of debt instruments would have substantial difficulty selling those instruments if payment were not voluntarily forthcoming. This would therefore add significantly to the risk of making loans to developing nations with poor credit ratings. The additional risk would naturally be reflected in higher borrowing costs to such nations. It could even make loans to some of them unobtainable in New York. A well-developed market of secondary purchasers of defaulted sovereign debt would thereby be disrupted and perhaps destroyed even though its existence pro-

---

**13.** The Brady Plan refers to a debt restructuring program in which a less developed debtor nation agrees to submit to an economic austerity program supervised and monitored by the International Monetary Fund in exchange for voluntary and partial debt forgiveness. *See Banco de la Nacion,* 194 F.3d at 366.

vides incentives for primary lenders to continue to lend to high-risk countries. *Id.* at 380.

In the present case, as in *Banco de la Nacion,* the plaintiff exercised his right to withdraw from voluntary negotiations. *See* Pl.'s Mot. at 11. The plaintiff states that he rejected the terms of the settlement because he found the terms unacceptable. *See id.* The plaintiff then proceeded to bring this action to recover in full for the defendant's breach of contract. *See id.* He had the right to do so. *See Banco de la Nacion,* 194 F.3d at 379–80. In light of these facts and considerations, the court concludes that the Paris Club Agreement and International Agreement do not limit the amount of damages that the plaintiff may recover in this breach-of-contract claim. *See id.*

## IV. CONCLUSION

For all of the foregoing reasons, the court grants the plaintiff's motion for summary judgment in its entirety, and denies the defendant's motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 3 day of March 2002.

## *ORDER*

GRANTING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in the court's Memorandum Opinion separately and contemporaneously issued,

it is this _____ day of March 2002,

**ORDERED** that the plaintiff's motion for summary judgment is **GRANTED**; and it is

**FURTHER ORDERED** that the defendant's motion for summary judgment is **DENIED**.

**SO ORDERED.**