**VIRTUAL DEFENSE AND DEVEL-
OPMENT INTERNATIONAL,
INC., Plaintiff,**

v.

**The REPUBLIC OF MOLDOVA,
Defendant.**

**No. CIV.A.98–161(RMU).**

United States District Court,
District of Columbia.

May 10, 1999.

Gary Scott Silverman, Rockville, MD, for plaintiff.

Jeffrey Scott Neeley, Manatt, Phelps & Phillips, Washington, DC, for defendant.

Herbert Emerson Forrest, U.S. Dept. of Justice, Fed. Programs Branch, Washington, DC, for Central Intelligence Agency, non-party.

Anne L. Weismann, U.S. Dept. of Justice, Civil Div., Washington, DC, for John Todd Stewart, Dept. of State, A. Rich Jackson, movants.

## MEMORANDUM OPINION

URBINA, District Judge.

### Denying Defendant's Motion to Dismiss

This case is brought by the plaintiff, Virtual Defense and Development International, Inc. ("Virtual"), against the defendant, the Republic of Moldova ("Moldova"), for breach of contract and quantum meruit. By Order dated March 31, 1999, the court denied the defendant's motion to dismiss this case. This Memorandum Opinion sets forth the reasons for the court's denial of the defendant's motion to dismiss.

## I. BACKGROUND

Following the dissolution of the Union of Soviet Socialist Republics, Moldova emerged as a sovereign nation facing severe economic turmoil. In an effort to bolster its weakening economy Moldova arranged to sell to Iran several MiG–29 planes, which were capable of firing nuclear weapons. The United States of America strongly opposed this sale on grounds of international security and, in early 1997, requested that Moldova cancel the scheduled transfer to Iran. Moldova agreed to comply.

Subsequently, in May and June of 1997, Boris Birshtein, the Economic and Commercial Advisor to the Moldovan President, contacted Marty Miller, an international consultant in New York, regarding economic opportunities in Moldova. Among the opportunities discussed was the sale of the MiG–29 planes. On August 5, 1997, Mr. Miller contacted Virtual to relay the message that Moldova was interested in having Virtual negotiate the sale of the MiG–29 planes to an entity approved by the United States. In September 1997 Virtual's President, Michael Spak, traveled to Moldova to work out the details of such an agreement. Subsequently, on September 17, 1997, Ion Ciubuc, the Prime Minister of Moldova, sent a

letter to Virtual stating that "[o]n behalf of the Republic of Moldova the Company [Virtual] is provided with authorization to initiate and sustain discussions with governments and/or private business entities concerning the realization of these aircrafts. This authorization is provided taking into account that this deal will be carried out with partners from [the] United States of America or other states with the authorization of the USA Government." (Pl.'s Opp. to Def.'s Mot. to Dismiss, Ex. A.)

Virtual alleges that a contract existed between it and Moldova whereby Virtual would receive a commission of fifteen percent upon successfully negotiating the sale of the MiG–29 planes. In its complaint, Virtual alleges that it negotiated a sale of the MiGs from Moldova to the United States for $60 million for which Virtual is entitled to its fifteen percent commission. In actuality, the MiGs were sold to the United States for $40 million in cash and $100 million in the form of economic aid. Contrary to Virtual's assertion that it negotiated this sale, Moldova alleges that "the negotiations between the United States and Moldova were nearly complete by the time Virtual was provided authorization to explore whether other possible purchasers for the MiGs existed." (Def.'s Mot. to Dismiss at 2.)

Following the sale, Virtual demanded payment of its commission in the amount of $9 million and was denied the fees. Consequently, Virtual filed a complaint in this court seeking damages for breach of contract and quantum meruit.

## II. DISCUSSION

### A. Legal Standard

The defendants argue that the plaintiff's complaint should be dismissed for one of two reasons: (1) sovereign immunity prohibits the court from exercising subject-matter jurisdiction; and (2) the act of state doctrine requires the court to abstain from hearing the case. In deciding on a motion to dismiss, the court must accept as true all well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Antonelli v. Sheahan,* 81 F.3d 1422, 1427 (7th Cir.1996). However, the court need not accept as true the plaintiff's legal conclusions. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

### B. Foreign Sovereign Immunities Act

■ Under the Foreign Sovereign Immunities Act ("FSIA"), foreign states are immune from the jurisdiction of the courts of the United States unless one of a limited number of exceptions applies. *See* 28 U.S.C. § 1604. Among these exceptions is the so-called "commercial activity" exception. *See* 28 U.S.C. § 1605. There is a two-part analysis to determine whether the FSIA allows a United States court to exercise jurisdiction over a foreign state in the context of the commercial activity exception. First, it is necessary to determine whether the activity at issue is a commercial activity for purposes of the FSIA. If the activity is not "commercial," then the FSIA precludes this court from exercising its jurisdiction. On the other hand, if the activity is "commercial," then the court must determine whether there is a sufficient nexus between the commercial activity and the United States.

### 1. Commercial Activity

■ The alleged actions that give rise to this case constitute commercial activities for the purposes of the FSIA. "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *see Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (stating that when the commercial exception applies "the foreign state shall

be liable in the same manner and to the same extent as a private individual under like circumstances"). In addition, 28 U.S.C. § 1602 states the well established maxim of international law that "states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned." As long as the action with which the suit is concerned could be undertaken by a private entity, then the action is commercial for the purposes of the FSIA.

In this case, the activities underlying the plaintiff's complaint are the steps taken by Virtual and Moldova to reach the alleged commission agreement and the eventual sale of the MiGs. Thus, in order to avoid dismissal, Virtual must establish that the commercial activity exception applies to these activities.

Moldova contends that the commercial activity exception does not apply in this instance because the type of action at issue, i.e., the sale of planes capable of firing nuclear weapons, is not the "type of action[ ] by which a private party engages in trade and traffic or commerce" because only sovereign nations own or sell these planes. *Weltover*, 504 U.S. at 614, 112 S.Ct. 2160 (internal quotations omitted). However, the legislative history surrounding the FSIA states that:

> [T]he fact that goods or services to be procured through a contract are to be used for public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus a contract by a foreign government *to buy provisions or equipment for its armed forces* or to construct a government building constitutes a commercial activity.

H. Rep. No. 94–1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad. News 6604, 6615 (emphasis added). In addition "[s]everal cases construing FSIA also make clear that a contract by a foreign government to buy equipment for its armed services constitutes a commercial activity to which sovereign immunity does not apply." *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 349 (8th Cir.1985) (citing *Behring Int'l v. Imperial Iranian Air Force*, 475 F.Supp. 383, 388–90 (D.N.J.1979) ("actions of Iranian Air Force in contracting for freight forwarding services is commercial and not sovereign"); *Texas Trading & Milling v. Federal Republic of Nigeria*, 647 F.2d 300, 309 (2d Cir.1981) (dictum) ("contract by foreign government 'for the sale of army boots' constitutes a 'commercial activity' "); *National Amer. Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 627, 641–42 (S.D.N.Y.1978)).

In the instant case, Moldova acted as a private participant in the market when in engaged in discussions with Virtual regarding the sale of the MiGs and when it eventually sold the MiGs to the United States. The mere fact that the goods sold by Moldova were MiG–29 planes does not change the nature of Moldova's actions. Accordingly, the court concludes that the relevant actions of Moldova constitute commercial activities within the definition espoused in the FSIA.

## 2. Nexus Between the Commercial Action and the United States

Having concluded that the activities upon which this lawsuit is based constitute commercial activities, the court must next determine whether there is a sufficient nexus between those activities and the United States such that this court may exercise jurisdiction. *See Weltover*, 504 U.S. at 617–18, 112 S.Ct. 2160. To demonstrate a sufficient nexus, Virtual must show that the actions in question satisfy one of the three clauses listed in the commercial activity exception to the FSIA. Under 28 U.S.C. § 1605(a)(2), a foreign state engaged in a commercial activity shall not be immune from the jurisdiction of the courts of the United States if

the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in

connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

In the instant case, the commercial activity engaged in by Moldova may be described as either (1) the alleged actions taken by Virtual, as an agent of Moldova, to facilitate the sale of the MiGs to the United States government or to some other entity approved by United States, or (2) the negotiations, which took place in Moldova, to hire Virtual as an agent. Under either description, one of the three clauses delineated in the commercial activity exception of the FSIA is satisfied. Accordingly, the court concludes that the plaintiff has demonstrated a sufficient nexus between the alleged commercial activity and the United States.

### a. Activities Carried on in the United States

 If the commercial activity is characterized as the actions taken by Virtual in its authority as an agent of Moldova, then the first clause of the commercial activity exception of the FSIA is satisfied. *See* 28 U.S.C. § 1605(a)(2). The nexus requirement of the commercial activity exception may be fulfilled if the action was "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). Here, Virtual was approached in the United States at its Bethesda, Maryland office and was subsequently given the authority to "initiate and sustain discussions with governments and/or private business entities concerning the realization of these aircrafts. This authorization is provided taking into account that *this deal will be carried out with partners from [the] United States of America or other states with the authorization of the USA Government.*" (Compl., Ex. A (emphasis added).)

The mere solicitation of Virtual in the United States may constitute a sufficient nexus with the United States. *See In re Papandreou*, 139 F.3d 247, 253 (D.C.Cir. 1998) (stating that "our cases do not foreclose the possibility that some degree of solicitation in the U.S. might satisfy the 'substantial contact' requirement"). Here, not only did Moldova solicit Virtual, a United States corporation, in the United States, but it also authorized Virtual to deal solely with United States entities or those approved by the United States government. These facts lead the court to conclude that the nexus requirement of the FSIA has been fulfilled.

It is true that the actions taken in the United States were those of Virtual, not Moldova, but they were taken based on Moldova's letter providing Virtual with the authority to do so on its behalf. In *Maritime International Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1104 (D.C.Cir.1982) (hereinafter *MINE*), the court held that even though the actions in question were carried on by an agent, they could still be attributed to the foreign state for purposes of the section 1605(a)(2) exception. Moreover, the legislative history surrounding a foreign sovereign's representation in the United States by an agent suggests that "a foreign state, in Congress's view, can surrender immunity by virtue of activities committed by an agent, and that, consequently, the 'carried on by' requirement can be interpreted in light of broad agency principles." *MINE*, 693 F.2d at 1105. "We also think it appropriate to note the well-established principle that, in assessing personal jurisdiction under either a constitutional due process standard or a statutory standard, courts may look to the contacts between the forum and agents of the defendant." *MINE*, 693 F.2d at 1105 (citing *Texas Trading*, 647 F.2d at 314–15).

Despite finding that no agency relationship existed between the parties in *MINE* because of a lack of "evidence of any writ-

ten or otherwise express authorization" from the defendant to the plaintiff or any other sufficient evidence on the record to support the finding of an agency relationship, the court noted other cases in which courts have found the nexus requirement was satisfied. In *Baker's Trust Co. v. Worldwide Transp. Services, Inc.*, 537 F.Supp. 1101 (E.D.Ark.1982), for example, the court found that the first clause of the "commercial activity" exception of the FSIA was fulfilled by activities performed by a bank and a company, which were acting as the defendant's agents in the United States. *See MINE*, 693 F.2d at 1106 (citing *Baker's Trust Co.*). Similarly, the actions taken by the agents of Moldova in the United States fulfill the first clause of the "commercial activity" exception. Not only was Virtual an agent of Moldova, but Marty Miller also acted as an agent of Moldova when he contacted Virtual in its Bethesda, Maryland office. Consequently, the court finds that the actions taken by Virtual in its capacity as an agent of Moldova satisfy the nexus requirement in the first clause of the commercial activity exception of the FSIA.

### b. Activities Carried on in Moldova

█ Alternatively, if the commercial activity at issue is characterized as the actual negotiations to hire Virtual to broker the sale of the MiGs, then the third clause of the commercial activity exception is applicable. The nexus requirement of the commercial activity exception of the FSIA may be fulfilled if the action at issue was based "upon an act outside of the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the U.S." 28 U.S.C. § 1605(a)(2). Here, Virtual traveled to Moldova to discuss and negotiate an agreement by which it would broker the sale of the MiG–29 planes. The actual negotiations took place in Moldova.

The focus of the inquiry then is whether the breach of the agreement, which was formed in Moldova, had a direct effect in the United States. "[T]he relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981). Moldova argues that there is no nexus between the commercial activity and the United States because it was never specified by the parties that the United States would be the place where payment would be made under the alleged commission agreement.

In *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143 (D.C.Cir.1994), the court held that because "[n]either New York nor any other United States location was designated as the 'place of performance' where money was 'supposed' to have been paid" by the defendant to the plaintiffs the action did not satisfy the direct effect requirement of the third clause. *Goodman Holdings*, 26 F.3d at 1146. In *Goodman Holdings*, however, Judge Wald wrote a separate concurrence "to emphasize that, for an act to have a 'direct effect' in the United States, there is no prerequisite that the United States be contractually designated as the place of performance." *Goodman Holdings*, 26 F.3d at 1147. Furthermore, in *Callejo v. Bancomer*, 764 F.2d 1101, 1111–12 (5th Cir.1985), the court distinguished the *Goodman Holdings* opinion by differentiating between plaintiffs that were based in the United States and those that were not. The court stated that "where the effects in the United States of an activity abroad are less fortuitous, courts have been much more willing to characterize them as 'direct.'" *Callejo*, 764 F.2d at 1111. For example, "nonpayment of a note payable in the United States to a United States company has been held to cause a direct effect in the United States for the purposes of Section 1605(a)(2)." *Callejo*, 764 F.2d at 1111 (citing *Texas Trading*, 647 F.2d at 312 and *Wyle v. Bank Melli of Tehran*, 577 F.Supp. 1148, 1158–59 (N.D.Cal.1983) ("financial loss to American plaintiffs suffi-

cient to constitute a direct effect in the United States")). Ultimately the court in *Callejo* found that, even though the United States was not specified as the place of payment, the fact that the plaintiffs lived in the United States was sufficient evidence that they were injured there. *Callejo*, 764 F.2d at 1111–12 ("In the present context, however, the question of whether there was a direct effect in the United States can be resolved without reference to the place of payment. Since the Callejos were located in the United States, the effects of Bancomer's breach were inevitably felt by them there.... [W]e do not perceive any material difference whether the legal place of payment was Mexico or the United States.").

Because Virtual is solely a United States corporation and the alleged contract contemplated that Virtual would receive compensation from the profits of the sale of the MiG–29 planes, the court concludes that the alleged breach of contract had a direct effect in the United States. In sum, whether the commercial activity in this case is described as (1) the actions taken by Virtual in its position as an agent of Moldova, or (2) the negotiation process to hire Virtual to act on behalf of Moldova, the court concludes that the nexus requirement is satisfied. Accordingly, the court concludes that it may exercise jurisdiction over Moldova for the purposes of this lawsuit.

### C. The Act of State Doctrine

■ Having determined that it has jurisdiction over this case, the court must next consider the appropriateness of exercising its jurisdiction over a foreign state in light of the "act of state" doctrine. Unlike the FSIA, the act of state doctrine is not jurisdictional, but prudential. "The act of state doctrine is similar to the political question doctrine in domestic law. It requires that the courts defer to the legislative and executive branches when those branches are better equipped to resolve a politically sensitive question." *International Ass'n of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries,* 649 F.2d 1354, 1358–9 (9th Cir.1981) [hereinafter *IAM* ]. In addition, the act of state doctrine aims to keep the courts "from deciding a case when the outcome turns upon the legality or illegality (whether as a matter of United States, foreign, or international law) of official action by a foreign sovereign performed within its own territory." *Riggs Nat'l Corp. & Subsidiaries v. Commissioner of Internal Revenue Serv.,* 163 F.3d 1363, 1367 (D.C.Cir.1999) (citing *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.,* 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990)). The burden of proving that the court should apply the act of state doctrine and abstain from hearing the case is on the party asserting the applicability of the doctrine. *See Alfred Dunhill v. Republic of Cuba,* 425 U.S. 682, 691, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Consequently, the burden in this case is on Moldova to demonstrate that the act of state doctrine should be applied.

■ Essentially, if a state is acting in the public interest then it is asserting its sovereignty and the act of state doctrine may apply. This may be so even if a court has jurisdiction over the foreign sovereign pursuant to the commercial activity exception to the FSIA. Consequently, under the act of state doctrine, a United States court would be discouraged from hearing even cases premised on commercial activities if hearing such cases would require the court to pass judgment on an underlying sovereign act. As the Ninth Circuit has noted,

[t]he act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity. While purely commercial activity may not rise to the level of an act of state, certain seemingly commercial activity will trigger act of state considerations.... While the FSIA ignores the underlying purpose of a state's action, the act of state doctrine does not.

*IAM,* 649 F.2d at 1360.

■ The Supreme Court has suggested a "balancing approach" when deciding if

the act of state doctrine applies. It is necessary to balance the judiciary's interest in hearing a case involving a commercial activity with the desire to avoid matters of foreign affairs controlled by the executive or legislative branches. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("Some aspects of international law touch more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."). In balancing these interests, a court should be mindful that the decision to deny judicial relief to a party should not be made lightly. *See IAM*, 649 F.2d at 1360. Viewing the facts of this case in light of this standard, the court concludes that the defendant has not met its burden of showing that the act of state doctrine should be applied.

██ To meet its burden and show that the act of state doctrine should apply to the sale of the MiG–29 planes and the alleged agreement to pay Virtual a commission fee, Moldova must show that it was acting in the public interest of its country and that a judicial inquiry into this action would either (1) cause harm to the interests of another branch of the United States government, or (2) question the legality of Moldova's sovereign actions.

This case is distinguishable from other instances in which courts chose to apply the act of state doctrine. In *IAM*, the court was asked to question the validity of OPEC's alleged price fixing practices. Despite the commercial aspect of the action the court chose not to hear the case noting that "OPEC's 'price fixing' activity has a significant sovereign component.... [T]he act of state doctrine remains available when such caution is appropriate, regardless of any commercial component of the activity involved." 649 F.2d at 1360. The *IAM* court reasoned that use of the act of state doctrine was appropriate be- ˎ cause the record "contain[ed] extensive

documentation of the involvement of our executive and legislative branches with the oil question.... It is clear that OPEC and its activities are carefully considered in the formulation of American foreign policy." 649 F.2d at 1360. Additionally, "[t]he United States and other nations have supported the principle of supreme state sovereignty over natural resources." 649 F.2d at 1361.

Here, the court is not asked to question the validity of a sovereign action, such as price fixing, but is merely asked to adjudicate a contract claim. In *Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 706, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), the court "declined to extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely commercial operations. Because the act relied on by respondents in this case was an act arising out of the conduct by Cuba's agents in the operation of cigar businesses for profit, the act was not an act of state." The actions that took place between Virtual and Moldova in this case are more similar to the activities at issue in *Alfred Dunhill of London* than they are to the sovereign actions of the OPEC countries at issue in *IAM*. Furthermore, Moldova has offered little evidence to demonstrate that the executive or legislative branches of the United States government have considerable involvement or interest in the issues presented by this case. In absence of evidence to the contrary, the court finds that this case involves a contract question that does not tread upon Moldova's sovereignty or hamper the objectives of another branch of the United States government. Accordingly, the court concludes that application of the act of state doctrine is not appropriate in this case.

### III. CONCLUSION

The commercial activity exception to the Foreign Sovereign Immunities Act provides this court with jurisdiction over Moldova for the purposes of this lawsuit. In

addition, Moldova has not provided sufficient evidence to meet its burden and establish that the act of state doctrine should preclude the court from hearing this case. For these reasons, Moldova's motion to dismiss was denied by Order dated March 31, 1999.