**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-2104**

_____

BLENHEIM CAPITAL HOLDINGS LTD.; BLENHEIM CAPITAL PARTNERS
LTD.,

             Plaintiffs - Appellants,

       v.

LOCKHEED MARTIN CORPORATION; AIRBUS DEFENCE AND SPACE
SAS,

             Defendants - Appellees,

       and

DEFENSE ACQUISITION PROGRAM ADMINISTRATION; REPUBLIC OF
KOREA,

             Defendants.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Liam O'Grady, Senior District Judge.  (1:20-cv-01608-LO-JFA)

_____

Argued:  September 16, 2022                    Decided:  November 15, 2022

_____

Before GREGORY, Chief Judge, and NIEMEYER and THACKER, Circuit Judges.

_____

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Chief Judge
Gregory and Judge Thacker joined.

_____

**ARGUED:** Hamish P.M. Hume, BOIES, SCHILLER & FLEXNER, LLP, Washington, D.C., for Appellants. Marc Laurence Greenwald, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Brian T. McLaughlin, CROWELL & MORING LLP, Washington, D.C., for Appellees. **ON BRIEF:** Samuel C. Kaplan, Jesse M. Panuccio, BOIES, SCHILLER & FLEXNER, LLP, Washington, D.C., for Appellants. Lyndsay A. Gorton, CROWELL & MORING LLP, Washington, D.C., for Appellee Lockheed Martin Corporation.

NIEMEYER, Circuit Judge:

Blenheim Capital Holdings Ltd. and Blenheim Capital Partners Ltd., Guernsey-based companies (collectively, "Blenheim"), commenced this action against Lockheed Martin Corporation, Airbus Defence and Space SAS, and the Republic of Korea and its Defense Acquisition Program Administration (the last two, collectively, "South Korea"), alleging that the defendants conspired to "cut it out" as the broker for a large, complex international military procurement transaction.[*]  Under the terms of the transaction, South Korea would acquire 40 F-35 fighter planes — valued at roughly $7 billion — manufactured by Lockheed and a "Next-gen" military satellite — valued at over $3 billion — manufactured by Airbus and equipped with capabilities for "integration with the F-35 fighter planes."  South Korea would pay $7 billion for the F-35s and $150 million toward the cost of the military satellite, with the remaining value of the satellite serving as an "offset" to effectively reduce South Korea's costs and thus "sweeten" the transaction. Further, the $150 million payment by South Korea was to be paid to Lockheed and passed on to Blenheim in installments, which Blenheim would use as capital to procure the financing for the purchase of three satellites from Airbus.  One of these satellites would be the military satellite for South Korea, and the other two would be retained by Blenheim, which it would operate, leasing their transmission capacity to earn income to pay for the satellite production and financing costs and provide Blenheim with "a total profit of at least

---

[*] For purposes of this appeal, when referring to Lockheed, we include its divisions, subsidiaries, and affiliated companies, as alleged by Blenheim in its complaint; and when referring to Airbus, we likewise include its affiliated companies, as alleged.

$500 million." The entire transaction was subject to the approval and supervision of the U.S. government.

For reasons that are vigorously disputed by the parties, Lockheed terminated the brokerage arrangement with Blenheim and restructured the transaction to be a "direct procurement" between Lockheed, Airbus, and South Korea, again with the approval and supervision of the U.S. government. Blenheim was left to bear the costs it had incurred in designing and working on the transaction, and it was also denied the prospects for profit from owning and operating two satellites.

In its first amended complaint, Blenheim alleged that the defendants (1) tortiously interfered with its brokerage arrangement and its prospective business expectations; (2) conspired to do so; (3) were unjustly enriched; and (4) conspired to violate federal and state antitrust laws. For subject matter jurisdiction, it relied on federal question jurisdiction under 28 U.S.C. § 1331, based on its federal antitrust claim, and on the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330(a), 1604, 1605(a)(2), and 28 U.S.C. § 1367 (supplemental jurisdiction) for its tort claims.

The district court granted the defendants' motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). With respect to the tort claims, it concluded that it lacked subject matter jurisdiction by reason of the Foreign Sovereign Immunities Act because South Korea was presumptively immune from jurisdiction under the Act and had not been engaged in "commercial activity," which is excepted from the immunity from jurisdiction conferred by the Act. And on the antitrust claim, it held that the action was barred by both the applicable four-year statute of limitations and the Foreign Trade

Antitrust Improvements Act of 1982, which requires that anticompetitive conduct have a sufficient effect on domestic or import commerce to be subject to U.S. antitrust laws.

Finding no reversible error in the district court's analysis, we affirm.

I

According to Blenheim's complaint, Blenheim "specializes in developing, structuring, and modeling international 'offset' transactions, which are often part of government procurements." "Offset" transactions are those in which the supplier in a procurement contract provides a collateral "sweetener" to the procuring government to reduce the procuring government's cost in the transaction. Offset transactions are "common in defense procurements."

Beginning in 2011, Blenheim worked with Lockheed to structure an offset transaction that would secure the sale of 40 F-35 fighter planes to South Korea after South Korea "accelerated its plans to enhance stealth-fighter capabilities in response to public outcry over North Korean aggression." The F-35 is a fifth-generation fighter plane manufactured by Lockheed for the U.S. government, and it represents the state-of-the-art in such military equipment and includes classified technology. Because of the F-35's high cost, Lockheed and Blenheim recognized that South Korea would require an offset transaction. Following much work, Blenheim proposed and the relevant parties accepted, with the approval of the U.S. Department of Defense, the terms of an offset transaction in which (1) Lockheed would provide South Korea with 40 F-35 planes with a value of roughly $7 billion; (2) Blenheim would arrange to have Airbus manufacture three satellites,

5

one of which — a  military satellite designed with "Next-gen" capabilities, including "integration with the F-35 fighter planes" — would be provided to South Korea, with the other two to be retained by Blenheim to operate; (3) South Korea would pay for the 40 F-35s and contribute $150 million toward the cost of the military satellite, which had an offset value of "more than $3.1 billion," effectively reducing South Korea's overall cost by almost one-half; (4) the $150 million payment would be transferred (via the U.S. Department of Defense) to Lockheed and then in installments to Blenheim for the purpose of obtaining financing for the cost of the satellites; (5) Blenheim would then operate the two satellites provided to it, leasing their transmission capacity to generate income to pay for all three satellites and to provide it with an estimated profit of $500 million.

Blenheim thus functioned as a broker in the transaction in accordance with the terms of an "International Brokerage Agreement" between it and Lockheed.  Because the transaction involved highly sensitive military equipment designed and manufactured for the U.S. military, it could be accomplished only as a "Foreign Military Sale," requiring approval and control by the U.S. Department of Defense.  Indeed, negotiations for the transaction took place in the offices of the U.S. Department of Defense, including the Pentagon, because the negotiations "involved classified information."  The statutes and regulations governing the sale of the F-35s to South Korea required all aspects of the transaction to be approved and managed by the U.S. government, including the U.S. government's receipt and disbursal of all monies in the manner agreed, including even the $150 million that South Korea paid to Lockheed for payment to Blenheim.

6

Blenheim's complaint alleged that, beginning sometime in 2015, Lockheed and Airbus (and later on, South Korea) conspired to "cut Blenheim out" of the offset transaction. Lockheed's motivation for doing so, according to Blenheim, was that Lockheed became concerned that carrying out the transaction would position Blenheim to compete with a division of Lockheed that was in the market for satellite transmission capacity. The complaint thus alleged that Lockheed, in furtherance of the conspiracy, delayed paying Blenheim the installments of the $150 million that it had received from South Korea via the U.S. Department of Defense. Lockheed made the first payment of $45 million on June 15, 2016 — which was after its due date — and then made no further payments. And finally, by letter dated October 6, 2016, it terminated Blenheim's role as the broker in the offset transaction. The letter stated:

> This letter will serve as formal notice by Lockheed Martin Oversees Corporation and its affiliates ("LMOC") to Blenheim Capital Partners and its affiliates ("Blenheim") of the immediate termination of International Broker Agreement LMOC-07-51 between LMOC and Blenheim dated October 26, 2007, including all amendments, exhibits, appendices, and attachments thereto (the "IBA").

> As discussed at length in previous written communications, Blenheim has materially breached the IBA (and relevant appendices and exhibits thereto). Such material breaches remain uncured. Accordingly, pursuant to Section 11.B. of the IBA, the IBA is terminated for cause.

The complaint alleged that Lockheed, Airbus, and South Korea then restructured the offset transaction, cutting Blenheim out of it, such that Lockheed agreed to provide 40 F-35s to South Korea and Airbus agreed to provide the military satellite. The U.S. Department of Defense approved the restructured transaction, and the military satellite for South Korea was launched from Cape Canaveral on July 20, 2020.

7

Blenheim commenced this action on December 31, 2020, alleging that the defendants (1) tortiously interfered with its International Brokerage Agreement and prospective business expectancies; (2) conspired to do so; and (3) were unjustly enriched. And by its first amended complaint, filed on May 21, 2021, Blenheim added claims under federal and state antitrust laws.

In response, the defendants filed motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) (lack of subject-matter jurisdiction) and 12(b)(6) (failure to state a claim), contending, first, that the district court lacked jurisdiction over Blenheim's tort claims by reason of the Foreign Sovereign Immunities Act and, second, that the complaint failed to state antitrust claims because they were barred by the applicable four-year statute of limitations and, in any event, failed to satisfy the requirements of the Foreign Trade Antitrust Improvements Act. The district court agreed with the defendants' positions and, by order dated September 30, 2021, dismissed Blenheim's first amended complaint.

From the district court's order, Blenheim filed this appeal, contending (1) that the offset transaction or the separate brokerage agreement was "commercial activity" and therefore was excepted from the immunity conferred by the Foreign Sovereign Immunities Act; (2) that the antitrust claims "accrued" within four years of its original complaint and that its first amended complaint adding the antitrust claims related back to the filing date of the original complaint; and (3) that its antitrust claims satisfied the requirements of the Foreign Trade Antitrust Improvement Act based on the alleged anticompetitive conduct's sufficient effect on U.S. commerce.

8

II

Blenheim contends first that the district court erred in dismissing its tort claims against South Korea for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611, because the basis for its claims was "commercial activity" by South Korea, which is excepted from the immunity conferred by the Act.

The FSIA provides that "a foreign state shall be *immune from the jurisdiction of the courts of the United States* and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604 (emphasis added); *see also id.* § 1330 (providing district courts with original jurisdiction over foreign states "not entitled to immunity under §§ 1605-1607"). Blenheim contends, however, that its claims fall within the exception relating to "commercial activity" as set forth in § 1605(a)(2). That section provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case — in which the action is based:
>
>> upon a *commercial activity* carried on in the United States by the foreign state; or
>>
>> upon an act performed in the United States in connection with a *commercial activity* of the foreign state elsewhere; or
>>
>> upon an act outside the territory of the United States in connection with a *commercial activity* of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (emphasis added) (reformatted for clarity). And "commercial activity," which is the subject of each exception, is defined as:

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be

9

determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

*Id.* § 1603(d).

Blenheim's argument thus raises, at its core, the question of whether its tort claims are based on "commercial activity," as excepted from the immunity from jurisdiction conferred by § 1604.

As a general principle, the subject-matter jurisdiction of a district court is a question of law for the court, not the jury, to decide. When a defendant files a motion under Rule 12(b)(1) challenging subject-matter jurisdiction and relying simply on the allegations of the complaint, the court must take the jurisdictional facts alleged as true — as in the case of a motion filed under Rule 12(b)(6) — and determine, as a matter of law, whether the court has jurisdiction. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). But if the defendant disputes the facts alleged for jurisdiction, providing the court with contradicting facts, the court "may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Id.*

Under the FSIA, a foreign state is "presumptively immune" from the jurisdiction of U.S. courts, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993), and when the foreign state asserts immunity from jurisdiction under the Act, the "focus shifts" to whether the plaintiff has demonstrated an exception to such immunity, a question of law, *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 212 (4th Cir. 2011) (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 212 F.3d 36, 40 (D.C. Cir. 2000). We review the district court's ruling on FSIA jurisdiction *de novo*, *see BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's*

10

*Def. Acquisition Program Admin.*, 884 F.3d 463, 473 (4th Cir. 2018), although we review the court's underlying findings of fact under the clear error standard. Here, however, the governing facts are those of the complaint, which we accept as true for purposes of our analysis.

In this case, when the defendants asserted a lack of jurisdiction under the FSIA, Blenheim contended that the conduct alleged in the complaint was based on "commercial activity," as excepted from immunity from jurisdiction under § 1605(a)(2). Focusing mostly on its obligation under the transaction to procure the military satellite for South Korea, it now asserts:

> Blenheim's claims are principally based upon the commercial transaction that provided a military satellite to South Korea as an "offset" for the F-35 purchase. This transaction was implemented through commercial contracts executed solely by South Korea and Lockheed (to deliver the satellite and related services to South Korea), and by Lockheed with Airbus SAS (to supply the satellite to Lockheed). The U.S. government was not a party to those contracts, and was not permitted to be a party to those contracts.

> \* \* \*

> The U.S. government never took title to the satellite, and thus did not act as an intermediary for this "offset" in the way it did for the F-35s. The district court's conclusion with respect to the F-35 sale is therefore inapplicable to the satellite piece of the transaction.

> \* \* \*

> Blenheim's claims are based principally upon the procurement and financing of the satellite purchase, which was clearly commercial activity.

Blenheim argues that, following the FSIA's directive to consider the "nature" of the activity, the offset transaction was commercial because it simply involved "the purchase and sale of goods." It argues further that it is irrelevant whether the goods being purchased could only be purchased by sovereigns for sovereign purposes, "such as military equipment

11

acquired for national defense," or whether they were "sold through the [Foreign Military Sales] Program."

The defendants do not deny Blenheim's characterization of the offset transaction as the sale of goods to South Korea, but they contend that Blenheim's argument is framed at too general a level. Rather, they argue, the inquiry must focus on whether the activity was of a type "exclusively reserved to sovereigns." When the inquiry is so directed, they maintain, it becomes clear that the sale of the F-35s and the military satellite, as a "Foreign Military Sale," could *only* be made between sovereigns exercising sovereign authority. As they argue:

> In [a Foreign Military Sale], the sovereign has no privity of contract with the private contractor. . . . In fact, the foreign sovereign effectively delegates control to the U.S. Government, from negotiating terms with the manufacturer's price and more, and it cannot directly sue the contractor for its performance. . . . [Foreign Military Sales] transactions are also subject to various national security and defense policies, and the foreign sovereign must meet a host of conditions. . . . Indeed, the [Arms Export Control Act] conditions [Foreign Military Sales] on a finding by the President that such sale will strengthen the security of the United States and promote peace.

At the outset, we agree with the defendants' observation that Blenheim's definition of commercial activity is made at too general a level, such that it would essentially encompass every purchase or sale of goods involving a foreign sovereign. We conclude that not every purchase of goods by a sovereign is "commercial activity." Some by their nature are, and some are not. Nonetheless, the issue is somewhat different. As the Supreme Court has pointed out, it is "whether the particular *actions* that the foreign state performs" are "the *type* of actions by which a private party engages in trade or commerce." *Republic*

12

*of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (first emphasis added) (cleaned up).

The FSIA defines "commercial activity" as "a regular course of commercial conduct" or a "particular commercial transaction." 28 U.S.C. § 1603(d). But it does not define "commercial." Rather, it provides only interpretative guidance, stating:

> The commercial character of an activity shall be determined by *reference to the nature* of the course of conduct or particular transaction or act, *rather than by reference to its purpose*.

*Id.* (emphasis added). The Supreme Court observed, "If this is a definition, it is one distinguished only by its diffidence; as we observed in our most recent case on the subject, it 'leaves the critical term "commercial" largely undefined.'" *Nelson*, 507 U.S. at 359 (quoting *Weltover*, 504 U.S. at 612). But the Court nonetheless undertook to define the term, beginning with its initial observation that Congress intended the immunity to apply to "sovereign or public acts (*jure imperii*)" and not to acts that are "private or commercial in character (*jure gestionis*)." *Id.* at 360. It then concluded:

> [A] state engages in commercial activity . . . where it exercises *only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns*. Put differently, a foreign state engages in commercial activity . . . only where it acts *in the manner of a private player within the market*.

*Id.* (emphasis added) (cleaned up); *see also Weltover*, 504 U.S. at 614. Thus, when the sovereign engages in a transaction peculiar to sovereigns — one in which private parties cannot engage — it is engaged in *sovereign activity* that is not excepted from the immunity conferred by the FSIA, even if it involves the purchase of goods.

13

Applying this test to the offset transaction in which Blenheim was a participant and from which it was subsequently "cut out," we conclude that South Korea was engaged in conduct peculiar to sovereigns and therefore was not engaged in "commercial activity" as excepted from the immunity from jurisdiction conferred by the FSIA.

We begin with the observation that the F-35s and the coordinating military satellite — the subjects of the offset transaction — involved highly advanced technology and that the sale of F-35s was restricted as a Foreign Military Sale and therefore could only be made with the approval and supervision of the U.S. government, and then only to a friendly country. It was also subject to controlling considerations of national security and public policy. While the satellite was manufactured by Airbus, a foreign company outside the United States, it was nonetheless to be designed with next-generation capabilities that included the capability of engaging with the F-35s, and its inclusion in the offset transaction was subject to the United States' approval and supervision. Indeed, the money for the satellite had to be paid to the United States and only then was disbursed by it, as provided by the terms of the approved transaction.

Foreign Military Sales cannot be made except in compliance with the Arms Export Control Act, 22 U.S.C. § 2751 *et seq.*, which requires approval of sales by the President of the United States and certification to Congress. And the President can approve such a transaction only if, among other things, (1) the President finds that the defense articles "will strengthen the security of the United States and promote world peace"; (2) the country to whom the articles are to be provided agrees "not to transfer title to, or possession of" them without the consent of the President; and (3) the country receiving the goods agrees to

14

"maintain the security" of them. *Id*. § 2753(a). Moreover, private parties participating in Foreign Military Sales are subject to criminal penalties if they are not appropriately registered and licensed. *Id.* § 2778(b), (c).

In this case, the *nature* of the offset transaction was a military procurement by South Korea from the United States of military items manufactured by Lockheed and Airbus, which was subject to plenary U.S. government control in furtherance of a policy of "international defense cooperation among the United States and those friendly countries to which it is allied by mutual defense treaties." 22 U.S.C. § 2751. And transactions such as the offset transaction in this case can be approved "only when they are consistent with the foreign policy interests of the United States." *Id.* It is clear that a private party could not engage in such a procurement, whether as buyer or seller. Such activity, by its nature, involves the transfer of military assets only to sovereigns and then only in furtherance of U.S. public policy and mutual military cooperation between countries. Moreover, it is not activity directed or influenced by the market but rather by the President's and Congress's judgment on national security concerns. Foreign Military Sales "reflect[] the national security interests of the United States," *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 707 (4th Cir. 2007), and therefore have a special contract structure that does not permit designation of the transaction as a "commercial activity."

Indeed, apart from the Arms Export Control Act, the entire procurement activity and transaction in this case was inherently sovereign activity. Activities such as creating and maintaining armed forces and obtaining for them arms and other tools of war — supplied only by sovereigns and to sovereigns in furtherance of mutual defense arrangements — are

15

peculiarly sovereign activities. And while the activity here did not involve the creation of armed forces, it did involve providing them with F-35s that can only be obtained from the U.S. government and only provided to a friendly government. Moreover, the sale of F-35s to South Korea was conditioned on the U.S. government's determination that the transaction would advance goals related to foreign relations and national defense. *Even the F-35s' manufacturer cannot engage in that activity*, much less other private parties. Thus, the activity at issue in this case was not the *type* that could be pursued by private citizens or corporations. A sovereign "engages in commercial activity . . . only where it acts in the manner of a private player within the market." *Nelson*, 507 U.S. at 360 (cleaned up). It follows that South Korea was not engaged in "commercial activity" within the meaning of the FSIA.

Blenheim seeks to avoid this conclusion by arguing that the harm to it was isolated to its arrangement with Airbus for the manufacture and sale of three satellites, two of which Blenheim would have operated itself. It thus seeks to break out its contract benefits from the offset transaction as a whole in order to argue that the satellite transaction was commercial because a private person or corporation could purchase satellites from Airbus. But this argument ignores Blenheim's own characterization of the transaction. The complaint described South Korea as having an indispensable role. It also described the satellite as satisfying South Korea's needs and military specifications, which were classified. Moreover, it alleged that the offset transaction, including Blenheim's arrangement with Airbus for the manufacture of the satellites, was complicated, integrating many components and parties and requiring Blenheim's expertise to design it. Blenheim's

16

arrangement with Airbus was a necessary and integral part of the procurement by South Korea of the F-35s. As Blenheim alleged, it designed the entire transaction as an integrated offset deal, in which "all four major stakeholders" would benefit — South Korea, Lockheed, Airbus, and Blenheim. It also alleged that the U.S. Department of Defense "play[ed] a major role in the sales" and was an "essential player." Indeed, Blenheim's particular arrangement with Airbus for the purchase of the satellites was also regulated by the United States. As Blenheim alleged, "[E]ven though sovereigns demand offsets as a 'sweetener' for defense procurements from foreign suppliers, in the U.S. [Foreign Military Sales] context, those sovereigns end up footing the bill for the offset with all monetary transactions *flowing through the Pentagon*." (Emphasis added).

Blenheim relies on two district court cases to argue that even taking the offset transaction as an integrated activity involving South Korea, the offset transaction by its nature was commercial activity. In the first case, *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1 (D.D.C. 1999), Moldova was seeking to sell Russian-made MiG fighter planes "to bolster its weakening economy." *Id*. at 2. The MiGs were being sold on the open market, drawing interest from Iran, to the alarm of the United States. Moldova then entered into a contract with Virtual Defense as broker to help it find a buyer that the United States would approve. The MiGs were thereafter purchased by the United States, and Virtual Defense then sued Moldova for its commission on the transaction. The district court concluded that the transaction was an open market transaction in which any private entity could have participated and was therefore "commercial" for purposes of the FSIA. *Id*. at 4. It explained:

17

> In the instant case, Moldova acted as a private participant in the market when i[t] engaged in discussions with Virtual regarding the sale of the MiGs and when it eventually sold the MiGs to the United States. The mere fact that the goods sold by Moldova were MiG-29 planes does not change the nature of Moldova's actions. Accordingly, the court concludes that the relevant actions of Moldova constitute commercial activities within the definition espoused in the FSIA.

*Id*. The transaction in *Virtual Defense* is clearly distinct from the highly regulated offset transaction in this case involving South Korea's procurement of F-35s and a related military satellite. While *Virtual Defense* did involve the sale of technically advanced military aircraft, the structure of the transaction was nothing more than an ordinary commercial sale by Moldova, without any regulatory oversight. Indeed, the United States became involved precisely because the MiGs were being sold on the open market, and possibly to Iran.

The second case relied on by Blenheim, *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88 (D.D.C. 2020), likewise does not significantly advance Blenheim's argument. While *Simon* concluded that the Foreign Military Sale involved there was commercial activity, it did so by analyzing the transaction at issue as one "like a contract to buy army boots," *id.* at 110 (cleaned up), which stands in sharp contrast to the goods being procured here and the circumstances of the procurement. Moreover, the court's reasoning gave scant attention to the manner in which Foreign Military Sales transactions are structured and regulated.

At bottom, we conclude that the offset transaction in this case was not the type of activity in which a private party could have participated and that South Korea did not act

18

in the manner of a private party in its procurement of the F-35s and the military satellite. *See Nelson*, 507 U.S. at 360 (quoting *Weltover*, 504 U.S. at 614).

Because we conclude that the offset transaction was not commercial activity as excepted from the immunity from jurisdiction conferred in the FSIA, we affirm the district court's conclusion that it lacked jurisdiction over Blenheim's tort claims. *See* 28 U.S.C. §§ 1604, 1367.

III

With respect to Blenheim's antitrust claims, the district court dismissed them based on both the applicable four-year statute of limitations and its conclusion that they were barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a. Blenheim contends that both rulings were in error.

On the limitations ruling, the district court concluded that Blenheim's claims "accrued" on October 6, 2016, when, as alleged in the complaint, Lockheed sent Blenheim a letter giving it "formal notice . . . of the immediate termination of the [International Brokerage Agreement]" between Lockheed and Blenheim. While Blenheim commenced this action on December 31, 2020, more than four years after the October 2016 date, it contends that it had challenged the October 2016 letter as invalid because Lockheed did not have cause to terminate the arrangement and that the agreement was actually terminated only when Lockheed responded to that challenge in January 2017 with a no-cause 30 days' notice of termination, which was within the four-year period before Blenheim filed its original complaint. Blenheim also argues that its injury "was not complete" until the

19

restructuring of the offset transaction was completed and the military satellite was actually launched in 2020, thus deferring or extending to 2020 when its action accrued.

The Clayton Act, under which Blenheim brought its federal antitrust claim, creates a private cause of action for "any person who shall be *injured* in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a) (emphasis added). And § 15b provides that such actions "shall be forever barred unless commenced within 4 years after the cause of action accrued." *Id*. § 15b. The Virginia statute, on which Blenheim brings its state antitrust claim, provides similarly. *See* Va. Code Ann. §§ 59.1-9.12(b), 59.1-9.14.

An antitrust action "accrues" "when a defendant commits an act that *injures* a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (emphasis added). "Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Id.* at 339; *see also GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 177 (4th Cir. 2007) (noting that "a cause of action generally accrues when a defendant commits an act that causes economic harm to a plaintiff").

Of course, a defense based on the statute of limitations is ordinarily raised as an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing that affirmative defense rests on the defendant, *see Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Therefore, the limitations defense cannot usually be addressed on a motion to dismiss under Rule 12(b)(6), which challenges only the *legal sufficiency of the complaint*,

not usually affirmative defenses that the defendant can assert to the complaint.  "But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Id.*; *see also Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993).  In this case, the defendants relied solely on the allegations of the complaint in moving to dismiss the antitrust claims as untimely.  Accordingly, to review the district court's ruling granting that motion, we must turn to the complaint.

Blenheim's complaint alleged, as relevant to when its antitrust causes of action accrued, that "from 2012 through 2016 Blenheim Capital devised and structured an innovative offset deal," as described in detail.  After Blenheim had "conceived, modeled, and begun the implementation" of the offset transaction, Lockheed, Airbus, and South Korea "conspired to cut Blenheim out of the deal," and they thus "benefitted from years of work and effort by Blenheim . . . to maximize their own advantages and profits."  The complaint alleged further that the defendants "agreed to proceed with a restructured transaction that cut out Blenheim *in late 2016*" (emphasis added), thus misappropriating Blenheim's "years of effort" on the offset transaction and leaving it with nothing in return.  In addition, the complaint alleged that while South Korea had paid Lockheed $150 million, which Lockheed was to pay to Blenheim in installments as seed money to finance the satellites, Lockheed paid Blenheim only one installment of $45 million, leaving $105 million unpaid.  According to the complaint, by late 2016, Blenheim had paid $20 million of the $45 million to Airbus as commitment for the financing, which never occurred.  And Blenheim was cut out from the transaction because, as alleged, Lockheed became

21

concerned that "Blenheim would become a competitor . . . for the sale and leasing of satellite capacity." In furtherance of the conspiracy, "on October 6, 2016, [Lockheed] provided Blenheim with a purported 'formal notice . . . of the immediate termination' of the [International Brokerage Agreement] for cause." Thereafter, "[h]aving conspired to cut Blenheim out of the offset transaction, Lockheed, Airbus, and South Korea proceeded with the military satellite procurement and worked to obtain the necessary approvals . . . to do so. On July 20, 2020, the satellite was launched from Cape Canaveral, Florida. . . . Though the launch was the fruit of Blenheim's labors, it received nothing."

Not only do the complaint's allegations place October 6, 2016, as the date when Blenheim was cut out of the offset transaction, they also describe how, as of that date, Blenheim was injured in its business and property and Lockheed, Airbus, and South Korea were enriched by the product of Blenheim's years of work and effort, seizing the fruits and denying Blenheim the benefits of the deal. Indeed, as of that time, October 6, 2016, Blenheim had already paid $20 million to Airbus as a finance commitment, for which it received nothing because of the October 6, 2016 termination. Finally, as the complaint alleged, Blenheim was also denied, as of that date, the benefit of procuring satellites and obtaining a profit from their operation. Indeed, the complaint stated dramatically that after October 6, 2016, Blenheim "received nothing." Under these circumstances, we conclude that Blenheim's cause of action accrued on October 6, 2016, when Blenheim felt the "adverse impact of [the] antitrust conspiracy." *Zenith Radio Corp.*, 401 U.S. at 339.

Blenheim argues that it was not injured until January 2017 because it was only then that Lockheed *legally* terminated the brokerage agreement. But the question of whether

22

Lockheed's October 2016 termination of the brokerage agreement caused Blenheim injury does not depend on whether that termination was legal. The complaint alleges clearly that Lockheed's October 2016 termination, whether legal or illegal, cut Blenheim out of the transaction and thus deprived it of its anticipated benefits.

Also, Blenheim's alternative argument that the accrual date of its action was extended until the restructured offset transaction was complete, *i.e.*, when the satellite was launched in 2020, lacks legal support. The fact that some damages *were to accrue in the future* does not extend the accrual date. *See Zenith Radio Corp.*, 401 U.S. at 339. As the Supreme Court noted, to recover future damages, the plaintiff still must "sue within the requisite number of years from the accrual of the action," when it *first* felt "the adverse impact of [the] antitrust conspiracy." *Id.* Because Blenheim felt adverse impacts immediately upon Lockheed's October 2016 termination of the brokerage agreement, the date of the satellite launch is not relevant to the date when the cause of action accrued.

Accordingly, we affirm the district court's ruling that Blenheim's antitrust claims are barred by the applicable four-year statute of limitations.

While the district court also concluded, indeed persuasively, that the FTAIA barred Blenheim's antitrust claims because the anticompetitive conduct alleged did not sufficiently affect U.S. domestic or import commerce, we do not address that issue in light of our ruling affirming dismissal on the basis of the statute of limitations.

The judgment of the district court is, accordingly,

AFFIRMED.

23